OPINION OF THE COURT
Chief Judge Cooke.
This appeal presents the question whether a municipality may be held liable for its inspector’s failure to discover a leak in a gas system that ultimately caused an explosion. Inasmuch as there was no special relationship between the injured parties and the municipality, the municipality may not be held liable to plaintiffs for damages resulting from the explosion. The order of the Appellate Division, therefore, should be reversed and the complaint should be dismissed as against the City of New York.
On the afternoon of December 11, 1970, a gas explosion leveled a three-story building in lower Manhattan, killing 12 persons, injuring many others, and virtually obliterating the commercial establishments in the building. Forty-three actions were brought against the City of New York, Consolidated Edison Company of New York, Inc., the plumbers who had installed the new gas system, and various other defendants. The actions were tried jointly to a jury on the issue of liability, and the city was found 65% liable, Consolidated Edison was found 10% liable, and Otto Schlink and Albert Bold, the plumbers, were each found 12.5% liable. The Appellate Division reversed and ordered a new trial with respect to the liability of the city and a new apportionment of damages (Gannon Personnel Agency v City of New York, 57 AD2d 538).
At the second trial, a jury again found the city liable. It apportioned damages 80% against China Dynasty Enterprises, Inc., a defunct corporation that had opened a restaurant in the building, 11% against Schlink, 1% against Bold, and 4% each against Consolidated Edison and the *188 city. Supreme Court denied the city’s motion to set aside the verdict against it (103 Misc 2d 60), and the Appellate Division affirmed.
The basis for imposing liability on the city was the action, or lack thereof, of the city inspector who visited the building nine days before the explosion. Expanded gas service had been necessitated by the conversion of the top two stories of the building to a Chinese restaurant. A new pipe was laid from the gas main under the street to the building. Schlink and Bold were responsible for connecting the piping inside the building to the incoming gas pipe in the basement. In doing so, they failed to install a shut-off valve at the point where the gas line entered the building, although such a valve was required by city regulations. In addition, a gas pipe leading to another room in the basement was left uncapped so that, if the system was put into operation, gas would flow out the pipe into the basement. There also may have been another gap in the piping where the restaurant’s new meter was to be installed. Consolidated Edison had given its permission for the installation of a temporary pipe to close the gap where the meter was to be placed.
Before renewed gas service to the building could be authorized, the new installation had to be inspected by both the city and Consolidated Edison. The city inspector twice visited the site while work was in progress. On December 2, 1970, the city’s inspector viewed the installation for the third and final time. Despite the presence of the open-ended pipe and the lack of the shut-off valve, the inspector told the plumber, Schlink, that he had done a “good job”, and that a “blue card” would be issued. The blue card, issued by the city building department, was required before Consolidated Edison could install the new meter for the restaurant and resume gas service. The card stated, “This is to certify that the Gas Pipes of premises known as 7-11 Ann Street in the Borough of Manhattan conform to the rules and regulations of this Department”. As noted, however, the gas piping system did not conform to the relevant rules and regulations.
After obtaining the blue card, the proprietor of the China Dynasty Restaurant took the card to Consolidated Edison’s *189 offices on Thursday, December 10,1970. The utility scheduled a final check by its employees of the new gas piping system for the following Monday, with resumption of gas service if the system was approved. Unfortunately, Consolidated Edison never had the opportunity to conduct its final inspection. Anxious to have the restaurant open for business over the weekend, the proprietor apparently made independent arrangements for the gas to be turned on. On Friday afternoon, two men, one of whom resembled the proprietor, were observed opening a sidewalk curb valve outside the building. This incoming gas escaped through the uncapped pipe inside the building. The strong odor of gas was soon detected, and the devastating explosion followed a short time later.
It is beyond dispute that the city inspector should not have authorized issuance of the blue card. City regulations required that every part of a new or altered gas piping system be inspected (Administrative Code of City of New York, § C26-1606.1). Such an examination surely should have disclosed the open-ended pipe. In addition, such an inspection should have revealed that the required interior shut-off valve was absent (Administrative Code, RS-16, PI 15.2, subd [a]). Although the Consolidated Edison employees presumably would have observed these defects in their final inspection and demanded that they be remedied before gas service was resumed, the fact remains that the city inspector, during his December 2 inspection, either failed to observe the defects or failed to insist upon their correction.
Nonetheless, the City of New York may not be held liable to the plaintiffs here for the omissions of its inspector. It is well established that “[ajbsent a special relationship creating a municipal duty to exercise care for the benefit of a particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation” (Sanchez v Village of Liberty, 42 NY2d 876, 877-878, dsmd on other grounds 44 NY2d 817). In Sanchez, the survivors of a fire in a multiple dwelling in the Village of Liberty brought wrongful death actions against a village and its building inspector, among others, in connection with the deaths of their spouses and children. *190 The plaintiffs alleged that the village and its inspector knew that the building violated various regulations in that it was a firetrap without fire escapes or other adequate means of emergency egress. This court dismissed the complaint against the village and inspector because of the lack of any special relationship. The court stated that “the statutes and ordinances involved in the case at bar create no such special relationship” (id., at p 878).
Sanchez is consistent with well-established principles limiting municipal liability for breach of a general statutory duty. In Motyka v City of Amsterdam (15 NY2d 134), a city fire captain’s knowledge that a defective heater had previously caused a fire and the city’s failure to see that the heater was repaired or removed were asserted as a basis of liability after the faulty heater caused a second fire. This court held that the complaint was properly dismissed, stating that municipal “tort liability has been held to exist where there has been some relationship on the part of the defendant to the plaintiff creating a duty to use care for the benefit of particular persons or classes of persons * * * but we have never gone so far as to hold that a general liability exists to the public for civil damage in event of failure to supply adequate police or fire protection” (id., at p 139 [citation omitted]; see, also, Garrett v Town of Greece, 55 NY2d 774; Messineo v City of Amsterdam, 20 AD2d 626, affd 17 NY2d 523; Steitz v City of Beacon, 295 NY 51; Moch Co. v Rensselaer Water Co., 247 NY 160).
Just as the housing regulations in Sanchez were designed to protect the safety of residents of multiple dwellings, so were the gas piping regulations in this case designed, at least in part, to protect persons from death, injury or property damage. The regulations were intended to benefit the injured persons, but in the broad sense of protecting all members of the general public similarly situated. This, alone, is insufficient to form a basis for municipal liability. Here, as in Sanchez, there has been shown no special relationship as would establish a municipal duty to these particular plaintiffs.
The sharp contrast with Smullen v City of New York (28 NY2d 66) is noteworthy. There, a city sewer construction inspector assured a worker that an 11-foot-deep trench *191 with unshored earthen walls was safe to work in. The walls, which by regulation should have been shored up, collapsed a few moments later, and killed the worker. It was held that the city could be held liable for its inspector’s negligence. In doing so, the court relied on the presence of the inspector at the site and his power to prevent the worker from entering the unsafe trench, stating that the inspector’s unsolicited opinion as to the trench’s safety “could easily be interpreted as more than acquiescence in decedent’s descent, and as an exercise of control by the only person in authority then present” (id., at p 73).
In this case, however, no such direct personal supervision or exercise of direction or control has been shown. In authorizing issuance of the blue card, the inspector did not in any sense direct, or even acquiesce, in the restaurant proprietor’s unauthorized opening of the sidewalk valve nine days later. And even this remote connection is absent between the city and the other persons who sustained injuries as a result of the explosion.
In Steitz v City of Beacon (supra), the city charter provisions involved there required maintenance of a fire department. This court stated “these provisions were not in terms designed to protect the personal interest of any individual and clearly were designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community” (295 NY 51, 55, supra). The same conclusion is appropriate here. The gas piping regulations are designed to benefit the plaintiffs as members of the community, but the regulations do not create a duty to the plaintiffs as individuals. To hold otherwise would be to subject municipalities to open-ended liability of enormous proportions and with no clear outer limits. The imposition of such liability, in addition to posing a crushing financial burden, might well discourage municipalities from undertaking activities to promote the general welfare. It could also impede municipal officials from allocating resources where they would most benefit the public, by making the prime concern the avoidance of tort liability rather than the promotion of the public welfare. The courts should not take it upon themselves to, in effect, reorder municipal priorities (see Riss v City of New York, 22 NY2d 579, 582).
*192 The arguments for extending municipal liability that are articulated by the dissent have been raised before and rejected. It is true that some individuals will suffer substantial hardship as a result of their inability to recover for their injuries from a municipality that negligently fails to enforce its own regulations. The deleterious impact that such a judicial extension of liability would have on local governments, the vital functions that they serve, and ultimately on taxpayers, however, demands continued adherence to the existing rule. All the more is this so when there has been reliance for decades on this doctrine for purposes of municipal fiscal planning. If liability to individuals is to be imposed on municipalities for failure to enforce statutes or regulations intended for the general welfare, that imposition should come from the Legislature.
In conclusion, it has long been the rule in this State that, in the absence of some special relationship creating a duty to exercise care for the benefit of particular individuals, liability may not be imposed on a municipality for failure to enforce a statute or regulation. No such special relationship exists here.
Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be reversed, with costs, and the complaint dismissed as against the appellant.