■ REB MICHAEL, INCORPORATED, Appellant, v SOUTHBRIDGE TOWERS, INC., Respondent.—Order of the Supreme Court, New York County (David B. Saxe, J.), entered December 19, 1985, which denied plaintiff Reb Michael, Incorporated's motion for a preliminary injunction barring defendant Southbridge Tow-

ers from entering into any lease for the ground-floor premises at 77 Fulton Street in Manhattan or delivering possession of said premises to any third party, and which vacated a prior temporary restraining order granting plaintiff such relief, unanimously reversed, on the law, with costs, to grant plaintiff's motion on the condition that plaintiff posts an undertaking in the sum of $50,000.

The subject premises at 77 Fulton Street were first leased by Stanley Weissberg from Southbridge Towers, Inc. in 1969. Weissberg then opened a restaurant on the premises known as "Stan's Other Place". In 1970, Weissberg transferred his interest in the restaurant to the Southbridge Restaurant Corporation (Restaurant Corporation). At the same time, and with defendant landlord's consent, Weissberg assigned his lease to the newly formed Restaurant Corporation. Thereafter, the lease, which was originally for a 20-year term, was extended on the agreement of landlord and tenant through June 1993.

In 1979, Weissberg and Michael Denmark, who were the sole owners of the Restaurant Corporation, negotiated a sale of the restaurant business to Seybruce Restaurant, Inc. for $375,000, of which $75,000 was paid in cash. The remaining $300,000 obligation was evidenced by promissory notes payable in monthly installments over a 10-year period. To secure payment of the promissory notes, three assignments and a sublease were simultaneously executed. The first of the assignments was that of the Restaurant Corporation's interest in the lease to Seybruce. The second was an assignment by Seybruce of its interest in the lease to plaintiff Reb Michael, Inc., a nominee corporation formed by Weissberg to participate in the subject security arrangement. The last of the three assignments was a reassignment by Reb Michael of its lease interest back to Seybruce. None of these assignments was delivered. They were instead held by Weissberg's attorney under an escrow receipt pending payment of the promissory notes. The sublease, however, was delivered and provided that Reb Michael would sublet the subject premises to Seybruce for a term to end on May 31, 1993, one month short of the end of the prime lease between the Restaurant Corporation and Southbridge Towers, Inc. The rent payable under the sublease included amounts due on the promissory notes.

The record discloses that the details of the above-described security arrangement were made known to defendant landlord, Southbridge Towers, and that defendant consented thereto. The June 29, 1979 letter documenting defendant's

consent was drafted by defendant and signed by the other interested parties. Although the letter displays some confusion, referring to the "new corporation" (later named Reb Michael) rather than Seybruce as the sublessee of the premises, there is no other confusion regarding the new corporation's role and obligations. The letter specifically notes that the new corporation was formed to secure Seybruce's payment of the promissory notes. The letter also states repeatedly that the new corporation, as successor to the Restaurant Corporation, is to remain obligated under the original 1969 lease.

Following the escrowed assignment and sublease in favor of Seybruce, the restaurant business all the while retaining the name "Stan's Other Place", changed hands twice. Syldor Restaurant, Inc., and later Alfin Gourmet, Inc., purchased the business. Each expressly assumed the security agreement and the sublease with Reb Michael in the dual role of obligee and landlord.

In 1985, Alfin Gourmet defaulted upon its rent and promissory note payments whereupon defendant landlord commenced an eviction proceeding against Alfin alone. Reb Michael was not named in the proceeding, received no notice of its pendency and did not appear. The action concluded in a stipulation wherein Alfin agreed to the issuance of a warrant of eviction, the execution of which was to be stayed on the condition that Alfin make installment payments to defendant totaling some $22,000. Alfin's default also led to the initiation of a nonpayment proceeding by Reb Michael. A final judgment of possession in Reb Michael's favor resulted.

After obtaining its judgment of possession, Reb Michael was advised that defendant, whose rent installments had not been paid by Alfin pursuant to the stipulation, had a judgment entitling it to possession of the subject premises. By letters dated October 21, 1985 and November 1, 1985, plaintiff informed defendant that in its view it (plaintiff) remained the major tenant of the premises and was not dispossessed as a consequence of defendant's nonpayment action against Alfin, to which it had not been made a party. Plaintiff offered to pay defendant the rent owed by Alfin so as to take the lease out of default. When its offer was rebuffed, plaintiff commenced the present action for a declaration that it is in fact the major tenant of the premises and for an injunction to prevent defendant from leasing the premises to a third party.

Plaintiff's application for a preliminary injunction was denied in the order appealed from. Noting the oft-cited criteria

for the grant of preliminary injunctive relief, i.e., irreparable injury to the movant in the absence of injunctive relief, the movant's likelihood of success on the merits, and a balancing of the equities tipping in the movant's favor *(Grant Co. v Srogi*, 52 NY2d 496), Special Term ventured that although plaintiff would sustain irreparable injury without the requested relief, there was little likelihood that plaintiff would prevail on the merits, and that a balancing of the equities favored defendant.

We agree that plaintiff will be irreparably harmed should preliminary junctive relief be withheld, but cannot agree with Special Term that the latter two criteria for preliminary injunctive relief have not been met.

Special Term reasoned that plaintiff had little prospect of prevailing on the merits since it appeared to have assigned its entire interest in the lease to Southbridge Restaurant, Inc. in 1970, leaving itself no reversionary interest as a tenant under the lease. This line of reasoning erroneously assumes that Stanley Weissberg, who made the 1970 assignment to the Restaurant Corporation, is the plaintiff in the within action. Manifestly, Reb Michael, not Weissberg, is the plaintiff here. The question then is what interest, if any, Reb Michael retained following the 1979 assignment and sublease agreement with Seybruce.

It cannot be maintained that Reb Michael effectively assigned its interest in the lease to Seybruce. This is because the Reb Michael-Seybruce assignment, having been placed in escrow pursuant to the terms of the security arrangement, was never delivered and, therefore, never took effect. *(Stanton v Miller*, 58 NY2d 192; *see also, 219 Broadway Corp. v Alexander's Inc.*, 46 NY2d 506.) Only by reason of the 1979 sublease did Seybruce acquire a present possessory interest in the premises from Reb Michael. It would appear, therefore, that it was Seybruce's interest as a sublessee that was passed first to Syldor and later to Alfin Gourmet. Reb Michael meanwhile remained in the position of the overtenant, duly receiving rent from its undertenants until Alfin's default.

The flaw in plaintiff's position is, of course, that if the escrowed series of assignments never took effect, plaintiff cannot, in reliance upon the assignments, lay any more claim to an interest in the premises than Seybruce or its successors. Strictly speaking, plaintiff may never have acquired any interest in the lease and, therefore, would have had nothing to convey to Seybruce.

Although this position has considerable logical merit, equitable considerations point to a different conclusion. Without passing finally upon the merits of plaintiff's case, we offer the following observations which seem pertinent to the likelihood of plaintiff's success on the merits. Although defendant's consent to the 1979 assignments and sublease only reflects those transactions imperfectly, it nevertheless acknowledges the role of the new corporation (Reb Michael) in securing payment of the promissory note given in connection with Seybruce's purchase of the restaurant business. Clearly, the security was in the recognized right of Reb Michael as the prime tenant to bring a summary nonpayment proceeding against its undertenant in the event of the undertenant's default. It seems unlikely then that defendant, while aware of Reb Michael's role in the security arrangement, was unaware that it would act as prime tenant. Moreover, as noted above, the restaurant was sold twice subsequent to the initial 1979 purchase by Seybruce. The record indicates that on the occasion of each sale, the purchaser, initially Syldor and then Alfin, executed an agreement by which it expressly assumed both the 1979 security agreement and the concurrently executed sublease between Reb Michael as landlord and Seybruce as tenant. Presumably, defendant was made aware of these tenant substitutions and the terms of the assumption agreements by which they were made. As the assumption agreements state plainly that the interest assumed was that of a sublessee pursuant to an underlease in which Reb Michael was named as landlord, it is highly improbable that defendant was either unaware or disapproving of plaintiff's purported retention of a reversionary interest in the premises.

Possibly, on a more complete record these inferences will be proven wrong, but the evidentiary picture with which we are presently faced indicates that all concerned, including defendant, understood and agreed in fact that plaintiff, as a purported prime tenant, would retain a reversionary interest in the subject premises.

Assuming that defendant has indeed acquiesced in plaintiff's security arrangement, it should not now be permitted to deprive that arrangement of all force and effect by belatedly claiming that plaintiff has no reversionary interest. Otherwise, plaintiff is effectively denied all opportunity to obtain payment of the unpaid portion of the 1979 purchase price. At the very least, plaintiff should not be practically foreclosed from litigating its claim to possession as it would be if the requested preliminary injunction were denied. Defendant

stands to lose little if anything from the grant of such relief since plaintiff has already posted bond of $25,000 for a stay pending the present appeal and will be required to post an additional $25,000 to cover defendant's potential rent loss during the 1986 calendar year. Indeed the only conceivable loss to defendant is its inability to rerent the premises to a third party at a rent higher than that for which plaintiff is presently obligated under the 1969 lease, extending in its modified form to 1993. Plainly, though, the possibility of obtaining a higher rental did not justify defendant in omitting plaintiff from the nonpayment proceeding against Alfin and furnishes no rationale for denying the relief here requested. It appears that plaintiff probably does have a reversionary interest in the premises, cognizable in equity if not at law, and that defendant was aware of this. Plaintiff should then have been joined in defendant's eviction proceeding against Alfin and thereby afforded an opportunity to litigate its claim to possession of the subject premises in an orderly fashion. Defendant's failure to name plaintiff in the earlier action will not now be permitted to inequitably inure to its benefit. Concur—Murphy, P. J., Ross, Rosenberger and Ellerin, JJ.