*870 OPINION OF THE COURT
Harold Baer, Jr., J.
Defendant City of New York moves, pursuant to CPLR 3211 (a) (7), to dismiss the complaint and all cross claims or, in the alternative, pursuant to CPLR 3212, for summary judgment. The motion to dismiss must be granted. Lovella Beres, plaintiff in one of these related actions, cross-moves to compel the City and the New York City Loft Board to comply with discovery requests and for sanctions. The cross motion is moot.
The City’s motion seems to have been made only on behalf of the City itself, not the Loft Board (the Board). I assume this was an oversight. In addition, the motion was made only in the Beres action, although the reply papers of the City reveal that the City defendants wish the motion to apply to the Jaramillo action as well. I decline the invitation. Since the City did not put Ms. Jaramillo on notice, no opposition papers were prepared by her. She ought not be foreclosed from stating her position. This problem, though, may well be an academic one only.
The City has not answered the complaint in Beres and has not submitted to complete discovery. Accordingly, that branch of the motion that seeks summary judgment is denied as premature.
The motion to dismiss is premised on the rule of law that a municipality or municipal agency shall not be liable for negligent failure to carry out its duties to the public at large. Plaintiff and the Callen defendants contend that the Loft Board owed a specific duty to plaintiff Beres sufficient to bring this case within the confines of an exception to this general rule.
In December 1989, a fire occurred in plaintiff’s loft. The fire was caused by faulty wiring. The inoperative condition of the sprinkler system did not help. The City defendants are at fault because they negligently failed to enforce orders that the sprinkler system be fixed, failed to compel the owner to comply with legal obligations respecting the building, failed to process plaintiff’s application for a finding of noncompliance so as to allow plaintiff to obtain a court order of compulsion and failed to obtain a court order. So plaintiff alleges, and so I must, on a motion to dismiss, assume such to have been the facts. Does plaintiff have a claim against the City defendants?
Plaintiff and the Callen defendants argue that the Legislature established a special legal regime to govern lofts to *871 protect a class of persons of whom plaintiff is one. (Multiple Dwelling Law arts 7-B, 7-C.) The Loft Board was created as the agency charged with issuance and enforcement of housing maintenance standards in loft buildings. The Loft Board accordingly promulgated regulations requiring owners of loft dwellings to register their buildings and to bring them into compliance with fire and safety standards. A set schedule was to be met. The building in this case, it is said, was subject to this legislation, which should have been complied with in 1988.
It is asserted that the City issued a number of violations against the building because of its problematic sprinkler system but that the City never enforced the orders. In April 1989, plaintiff and other tenants of the building filed with the Board an application asserting the existence of hazardous safety violations, including the sprinkler problem. This application sought code enforcement from the Board and a finding of noncompliance by the Callen defendants. The Board was asked to seek an order compelling compliance with the law. A finding of noncompliance is a prerequisite to legal action by the tenants. (Multiple Dwelling Law §284 [1].) The Board never bestirred itself to act. As a result, plaintiff and the Callen defendants argue, plaintiff suffered the very thing the law intended that she and others similarly situated be protected against — a disastrous fire.
As a general rule, municipalities are not liable for breach of a broad statutory duty. (O’Connor v City of New York, 58 NY2d 184, 190-191 [1983]; Motyka v City of Amsterdam, 15 NY2d 134 [1965].) Liability depends upon the existence of "some relationship * * * creating a duty to use due care for the benefit of particular persons or classes of persons”, as where there exists a statutory command in favor of a special class. (Motyka v City of Amsterdam, supra, 15 NY2d, at 139.) The duty of a city to furnish water for the fighting of fires inures to the benefit of the public at large. (Mach Co. v Rensselaer Water Co., 247 NY 160 [1928] [Cardozo, Ch. J.].) The duty to provide adequate police protection is owed only to the general public. (Florence v Goldberg, 44 NY2d 189 [1978].)
On the other hand, a special relationship was found to exist between the police and an assaulted child where the police knew of the father’s violence and an order of protection, the mother pleaded for help and the police reassured her that they would act. (Sorichetti v City of New York, 65 NY2d 461 [1985]; compare, Kircher v City of Jamestown, 74 NY2d 251 *872 [1989].) Where a known, blatant and dangerous condition exists and a municipality represents the premises to be safe, which representation is justifiably relied upon, the municipality can be held liable. (Garrett v Holiday Inns, 58 NY2d 253 [1983].) Similarly, if a municipality undertakes to provide a crossing guard to protect children, causing a mother to rely upon the presence of the guard, the municipality may be held liable. (Florence v Goldberg, supra.)
A number of cases have found no liability for the failure to enforce safety regulations, as a result of which fires, a building collapse and an explosion occurred. This was the outcome in Sanchez v Village of Liberty (42 NY2d 876 [1977], remittitur amended 44 NY2d 817 [1978]), even though the regulations were intended to protect inhabitants of multiple dwellings against just such disasters. (See also, Motyka v City of Amsterdam, supra; Worth Distribs. v Latham, 59 NY2d 231 [1983].) This was the result in these cases even though it was claimed that the municipality knew of the violations. In O’Connor v City of New York (supra, 58 NY2d, at 190), regulations on new or altered gas piping were designed to protect the victims against gas explosions, but only "in the broad sense of protecting all members of the general public similarly situated.”
This case is not governed by the police duty cases, such as Sorichetti (supra) and Kircher (supra). In those cases, the police, as a result of direct contacts with the injured party, undertook to protect that particular party against a unique, known danger and the party relied upon the undertaking. (See, Cuffy v City of New York, 69 NY2d 255 [1987].) Plaintiff Beres recognizes at one point that this line of cases is analytically distinct, although she tries to argue anyway that the elements applicable to these cases are satisfied in this one. That argument is unpersuasive. There was not here a known, unique danger that actually threatened plaintiff Beres alone among all persons. This case, rather, concerns violations on a building which might, if uncorrected, lead to trouble or even disaster. This case is just like any other in which some persons might be harmed if a government agency were to leave safety violations uncorrected. The real issue is whether or not the loft legislation amounts to the statutory imposition of a special duty owed for the benefit of particular persons.
Ms. Beres, an artist, is at pains here to underscore her special status as a beneficiary of the current loft legislation. In doing so she exaggerates somewhat. It is true that the legislation now making up article 7-B originally reflected a desire to *873 assist artists, but its beneficiaries at the time of the accident in this case were not limited to them. The Legislature recognized that loft, commercial and other nonresidential buildings had recently lost commercial tenants and that it was desirable that the space in those buildings be made available as homes/ workspaces for artists and as residences for the general public. The Legislature in fact declared that laws governing "the alteration of such buildings to accommodate general residential use” would have to be more restrictive than past statutes addressed only to artists’ quarters (Multiple Dwelling Law § 275). It was therefore declared as the purpose of the legislation to create State-wide standards "for all alterations of nonresidential buildings to residential use.” (Multiple Dwelling Law § 275; see, Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 66 NY2d 298, 303 [1985].) The legislation (art 7-C) that created the Loft Board was the product of concern about the consequences of numerous conversions of commercial buildings to residential use, not artists’ quarters only. The provisions were enacted "to protect the public health, safety and general welfare.” (Multiple Dwelling Law § 280.)
It is my judgment that this legislation does not create a special duty owed to particular persons within the contemplation of Motyka (supra), O’Connor (supra) and the like. The aim was not to carve out a distinct, definable group from the great public as a whole and confer a special benefit or protection upon that group. Rather, what prompted the legislation was a desire to fill a gap, to bring commercial buildings being used for living space into compliance with rules governing apartment buildings and all other multiple dwellings. The purpose was to make these residential tenants like all others. As section 280 puts it, legislation was needed "to effectuate legalization * * * of the present illegal living arrangements in such 'de facto’ multiple dwellings”. The Legislature’s concern embraced the absence of safety measures and building maintenance standards, but it was not restricted to that. It was also directed at the financial aspects of this form of living, such as questions of rent adjustments. (See, Multiple Dwelling Law §§ 280, 282.) Article 7-C creates an interim regime and one not limited to questions of safety. Under the direction of the Loft Board, these buildings are to be brought into compliance with building codes and maintenance standards and then to be integrated into the rent stabilization system. Article 7-C applies only temporarily. Thereafter, normal rules will govern. *874 (Blackgold Realty Corp. v Milne, 119 AD2d 512 [1st Dept 1986], affd 69 NY2d 719 [1987]; Axelrod v French, 148 Misc 2d 42 [Civ Ct 1990]; Loft Realty Co. v Aky Hat Corp., 123 Misc 2d 440 [Civ Ct], affd 131 Misc 2d 541 [App Term, 1st Dept 1984].)
There is no doubt that if a City agency fails to enforce a safety regulation and a fire or explosion results, the tenant cannot sue the City, even if the City was aware of a violation. Motyka (supra) concerned a failure to enforce a fire safety provision of the Multiple Residence Law. Sanchez (supra) was similar. Worth (supra) involved a failure to enforce regulations governing the safety of building structures. In O’Connor (supra), the plaintiffs sought to impose liability on the City because of the inadequate enforcement of gas pipe regulations by a City inspector. In these cases the defect in the plaintiff’s theory was, in the words of the O’Connor Court, that the laws and regulations "were intended to benefit the injured persons, but in the broad sense of protecting all members of the general public similarly situated.” (58 NY2d, at 190.)* If a City agency is charged with having failed to enforce regulations requiring the installation of certain wiring and a sprinkler system in a high-rise apartment building on the Upper East Side, a tenant who is burned out cannot sue the City. It would be strange if, on the other hand, a tenant in a loft building on the Lower East Side who suffers the identical misfortune could sue because of a failure to enforce similar regulations by the agency (the Loft Board) whose function it is to bring lofts into compliance with the generally applicable codes. The beneficiaries of the interim regime would have greater rights than those of the permanent regime. In reality, then, plaintiff was a beneficiary of a legislative effort to protect and aid the general public.
The Callen defendants point out that Ms. Beres could not bring an action against them to enforce the provisions of article 7-C unless the Loft Board first determined that there was noncompliance by the owner. (Multiple Dwelling Law § 284 [1] [iii].) In this regard the loft tenant’s position is not different from that of the tenant of a permanent multiple dwelling. The tenant may seek a writ of mandamus against *875 the City agency if it fails to carry out its duty to rule on compliance. Alternatively, the tenant may withhold rent. A landlord of an interim multiple dwelling cannot succeed in a nonpayment proceeding without establishing compliance with the Loft Law. (Cromwell v Le Sannom Bldg. Corp., 171 AD2d 458 [1st Dept 1991]; 902 Assocs. v Total Picture Creative Servs., 144 Misc 2d 316 [Sup Ct 1989].)
New York City Coalition to End Lead Poisoning v Koch (138 Misc 2d 188 [Sup Ct 1987], affd 139 AD2d 404 [1st Dept 1988]) is certainly helpful to Ms. Beres’ argument. The First Department’s affirmance was without opinion and the decision of Justice Wilk on the issue was brief and contained no analysis of the cases. It seems to me, though, that the regulations there were not aimed at the general public, i.e., all those residing in buildings, but rather at a special, narrow class, young children, who are uniquely at risk of devastating consequences from a special health hazard. This case is different.
The motion to dismiss is therefore granted. The cross motion is moot.

 Garrett v Holiday Inns (supra) distinguished these cases on the ground that there the municipality was alleged to have, by issuance of a false certificate of occupancy, affirmatively misrepresented the absence of violations. (58 NY2d, at 263, n 5.) However persuasive that distinction (see, supra, 58 NY2d, at 264 [Jasen, J., dissenting in part]), it is not pertinent in this case. The complaint here is of inaction, not misrepresentation, by the Board.