Bellacosa, J.
(dissenting). Affirming this plaintiff’s $4.3 million jury award against the Transit Authority is not required or supportable under sound legal principles. This case should not be driven by general nostrums pertaining to ordinary negligence cases. Therefore, I respectfully dissent, vote to reverse the order of the Appellate Division, and would dismiss the plaintiff’s case outright.
Plaintiff McCummings was one of the muggers who attacked Jerome Sandusky, 72 years of age, in the 96th Street-Eighth Avenue line subway station on June 28, 1984. A team of on-duty undercover transit police officers responded to Sandusky’s cry for help, and witnessed plaintiff McCummings rummaging through Sandusky’s pockets as another mugger held him down in a choke hold. Concededly, Sandusky suffered serious bodily harm.
On the most favorable view of the evidence to plaintiff, he was caught in the act of committing an all-too-common subway attack on a particularly vulnerable target of opportunity. He broke off from the attack only to avoid arrest by attempting to flee the crime scene after an alert from his lookout. The officer, who fired his weapon and seriously wounded the perpetrator-turned-plaintiff, testified that the plaintiff and another *931 of the muggers, only several feet away, lunged at him when he rushed into the crime scene. The officer’s attempt to rescue the victim and arrest the culprits consumed only seconds. As a defendant in the criminal proceeding, the plaintiff in this civil action pleaded guilty to attempted robbery in the second degree. Ironically, his criminal sentence is capped by a multimillion dollar recovery against the citizenry at large.
The dispositive issue is whether the defendant City Transit Authority’s motion to dismiss the excessive force civil claim by McCummings should have been granted. I conclude that the evidence irrefutably supports the view that the officer acted reasonably and without excessive force, as a matter of law, under Penal Law § 35.30, Tennessee v Garner (471 US 1) and Graham v Connor (490 US 386). Thus, I am baffled by the inversion of justice wrought in this case. The New York justification statute and the United States Supreme Court precedents combine to create a special duty universe within which to assess the standard of care by which to measure the officer’s response to an emergency violent crime situation.
That special duty universe involving municipal tort liability is ignored by the Court. Instead, it treats this case as a plain negligence claim governed by pro forma rubrics. The transit officers’ paramount job was to stop the criminal assault and robbery, and to apprehend those committing the dangerously illegal acts in their presence. Indeed, that was the special obligation of this antimugger subway patrol unit. These are features which make this case different and call for distinct, realistic and proportionate rules of governmental responsibility and judicial review.
The fact that reasonableness of conduct, including that of municipal agents, is ordinarily a jury question (see, Dunn v State of New York, 29 NY2d 313; Stanton v State of New York, 26 NY2d 990, rearg denied 27 NY2d 817), does not compel the result here driven by procedural generalities. In effect, the "majority would delegate to the jury the responsibility to determine the applicable social policy, thus abdicating the judicial role” (Basso v Miller, 40 NY2d 233, 243 [Breitel, Ch. J., concurring]).
This Court has expressly recognized that not every case in which the ultimate issue is reasonableness must end with a jury. The Court has instead manifested prudential suppleness in its substantive and procedural rules governing municipal liability. Thus, in Akins v Glens Falls City School Dist. (53 *932 NY2d 325, rearg denied 54 NY2d 831), the Court found the question of a municipal duty of reasonable care resolvable as a matter of law. Similarly, in Andre v Pomeroy (35 NY2d 361), this Court reversed an order of the Appellate Division and granted the plaintiffs motion for summary judgment that the defendant was negligent as a matter of law. While the Court acknowledged the rarity of using summary judgment in negligence cases, it realistically ruled that the defendant’s negligence was "conclusively established,” since her behavior "could not be considered reasonable conduct under any standard and it does not take a trial to resolve that point” (id., at 365). The Court’s refusal to apply that principle here for another exceptional situation, on the opposite side of the liability spectrum, is rigidly uneven, because if negligence can be conclusively established as a matter of law on summary judgment, all the more should lack of negligence be susceptible to a directed verdict motion, after all plaintiffs evidence has been presented (see also, Carter v City of Chattanooga, 803 F2d 217, on reh 850 F2d 1119, cert denied 488 US 1010; Pruitt v City of Montgomery, 771 F2d 1475, reh denied 777 F2d 704; Ramos Ayala v Diaz Martinez, 707 F Supp 75).
Since the eclipse of general municipal immunity, this Court has not shirked its common-law responsibility of restoring appropriate policy-based barriers to otherwise open-ended municipal liability. In Weiss v Fote (7 NY2d 579, rearg denied 8 NY2d 934), the Court determined that the State could not be held liable for the alleged faulty placement of a traffic signal. The Court recognized the exercise of municipal expert discretionary judgment in planning for the public safety as follows:
"Nothing in the legislative history of the Court of Claims Act * * * indicates that the waiver provision was designed to override the well-defined and carefully reasoned body of law governing the measure of the State’s responsibility for highway safety. The city’s defense which we here sustain rests not on any anachronistic concept of sovereignty, but rather on a regard for sound principles of government administration and a respect for the expert judgment of agencies authorized by law to exercise such judgment. In the area of highway safety, at least, it has long been the settled view * * * that courts should not be permitted to review determinations of governmental planning bodies under the guise of allowing them to be challenged *933 in negligence suits” (id., at 588 [emphasis added]).
Realism in the realm of public safety is the touchstone of that case and its holding.
By contrast, the instant case approaches the surreal zone. It involves split-second decisions by public safety employees made in the most dangerous and volatile circumstances — here, transit officers rushing into ongoing, highly dangerous and violent criminal activity. These public safety employees are surely no less expert than city planners who decide, with relaxed reflection, where a stop sign or a traffic signal belongs. The Weiss rationale thus helps to support dismissal of this case and avoidance of counterproductive second-guessing exercises (see, Dunn v State of New York, 29 NY2d 313, supra; Stanton v State of New York, 26 NY2d 990, supra).
Allowing criminal defendants involved in the commission of violent felonies to reach civil juries as a matter of course on the issue of excessive force taunts the concept of evenhanded justice. This plaintiff, a convicted mugger, can readily gain a lottery-size verdict against the public fisc while faultless citizen victims, like the elderly person in this case, are blocked from even their day in court for gross police nonfeasance under special duty municipal barriers (contrast, Weiner v Metropolitan Transp. Auth., 55 NY2d 175; see, e.g., Kircher v City of Jamestown, 74 NY2d 251; Merced v City of New York, 75 NY2d 798; see also, Santangelo v State of New York, 71 NY2d 393). The fact that some distinctions emerge in cases involving various municipal duty categories underscores the need for a limiting analytical and dispositional path. Notably, our Court has also withheld negligence recoveries from injured persons, as a matter of policy line drawing, when they assume certain risks (see, e.g., Turcotte v Fell, 68 NY2d 432; Akins v Glens Falls City School Dist., 53 NY2d 325, supra). If nothing else, this plaintiff should be deprived of his windfall against the municipal pocketbook on the public policy and theory that he assumed the risk of his injuries as part of the hazards of his chosen predatory pursuits.
In Tennessee v Garner (471 US 1, supra) and Graham v Connor (490 US 386, supra), the United States Supreme Court set standards for the use of force to apprehend a suspect in a nonpersonal, property-type crime. Gamer added, however, that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to *934 prevent escape” (471 US, at 11, supra). That is precisely this case. Thus, while the reasonableness inquiry is an objective one (Graham v Connor, supra, at 397; see also, People v Goetz, 68 NY2d 96), where, as here, the facts and circumstances fall even more compellingly within the template painted by Garner — a crime of force in actual progress against a person in a place of public transportation — the use of deadly force can be found to be reasonable and justifiable as a matter of law in a civil lawsuit context.
Furthermore, the Court’s holding today undermines the Legislature’s exceedingly plain policy on justification, expressed in the pertinent self-defense provision of the Penal Law, section 35.30:
"1. A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or attempting to prevent the escape from custody, of a person whom he reasonably believes to have committed an offense * * * may use deadly physical force for such purposes only when he reasonably believes that:
"(a) The offense committed by such person was:
"(i) a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person”.
That statute reflects, with Gamer, the public policy that the use of deadly force to apprehend a criminal in the actual commission of or escape from a violent felony is unquestionably lawful and reasonable. Plaintiff conceded as much by his own evidence and theory in the civil case and by his plea of guilty in the criminal case. I cannot imagine a more precise tracking of the words and commands of Penal Law § 35.30 than the actions taken by the officer on this subway platform.
The Court disregards the statute’s and Garner’s cogent relevancy by sidetracking the procedural context of the situation. Moreover, its characterization of the pertinent rule as a one-way proposition benefitting only criminal actors is puzzling. Garner, like this case, was a civil suit for damages sustained as a result of the alleged use of excessive force in apprehending a suspect. The United States Supreme Court plainly intended that its Fourth Amendment analysis for assessing the lawfulness of the use of deadly force should also be applied to the issue of reasonableness of the actions of the law enforcement officials and their municipal superiors (Ten *935 nessee v Gamer, 471 US, at 22, supra). In now holding that the standard enunciated in Gamer applies only to the issue of the "arrestee’s Fourth Amendment rights” (majority mem, at 927), the Court wastes Gamer’s guidance. The anomaly inflicted is that "[t]he imposition of such liability, in addition to posing a crushing financial burden, might well discourage” law enforcement officers and their superiors from acting to promote the general welfare (O’Connor v City of New York, 58 NY2d 184, 191, rearg denied 59 NY2d 762). Tort law, after all, is intended to shape and conform conduct to reasonable patterns.
In sum, the application in this case of staple negligence nostrums of a procedural and substantive variety will result in inappropriate cases being universally pitched to juries, whose potentially excessive determinations are beyond this Court’s review powers on almost all issues. As foreseen in O’Connor v City of New York (supra), the devastating toll includes shifting the primary concern of law enforcement employees from ensuring the safety of the public to ensuring that they and their municipal employers are not exposed to staggering money judgments for, in effect, doing their jobs of crime prevention. The costs to society of such calculated indifference to innocent citizens in dire need are compounded by the payments of large judgments out of a diminishing public purse. This case guarantees that society will suffer the double albatross of both those costs. This plaintiff mugger may have been interrupted and prevented from stealing Sandusky’s wallet, but he ultimately makes crime pay by picking the public’s pocket for the big score of $4.3 million plus interest.
Chief Judge Kaye and Judges Simons, Hancock, Jr., and Smith concur; Judge Titone dissents in part and votes to dismiss the appeal in part and reverse in part in an opinion; Judge Bellacosa separately dissents in part and votes to dismiss the appeal in part and reverse in part in another opinion.
Order, insofar as it affirmed the judgment of Supreme Court, affirmed, with costs, in a memorandum. Appeal, insofar as taken from that portion of the Appellate Division order which affirmed the order of Supreme Court denying defendant’s postjudgment motion to vacate and set aside the verdict and judgment, dismissed upon the ground that that portion of the order does not finally determine the action within the meaning of the Constitution.