**Christian VALENCIA, an Infant by his Mother and Natural Guardian, Teresa FRANCO, Plaintiffs,**

v.

**Sung M. LEE and Shiu Chun Lee and The City of New York, Defendants.**

No. CIV.A. 97–3205.

United States District Court, E.D. New York.

Dec. 13, 2000.

Frank J. Arrieta, Fitzgerald & Fitzgerald, P.C., Yonkers, NY, for Plaintiffs.

Marti Hirst, Corporation Counsel, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

Infant plaintiff Christian Valencia, by his mother and natural guardian, Teresa Franco, brings this action against Sung M.

Lee and Shiu Chun Lee (the "Lees"), owners of the apartment in which they lived, and the City of New York (the "City") seeking compensatory damages for developmental injuries Christian sustained from exposure to lead paint. At a six day bench trial, causation of plaintiff's disabilities was fiercely contested and their severity was somewhat disputed. Otherwise, the factual background of the case was largely undisputed.

## Background

### (1)

Teresa Franco was born in Guayaquil, Ecuador, and moved to the United States in 1988. On March 11, 1992, she and Julio Valencia, who is now her husband, had a child, Christian Valencia. For three and one-half years, from Christian's birth through October of 1995, he and his mother lived in an apartment in a building located at 441–46th Street in Brooklyn, New York. During the family's entire tenancy in this building it was owned by defendants Sung M. Lee and Shiu Chun Lee (the "Lees").

While pregnant with Christian, Ms. Franco received her prenatal care at Lutheran Medical Center in Brooklyn, New York, and after his birth continued to bring Christian to a clinic at that facility, Sunset Park Family Health Center, for his pediatric care. Pl.Ex. 4. As required by law, on or about his first birthday, Christian's blood was tested as part of his pediatric care, and his blood lead level measured 14 micrograms per deciliter ("$\mu$g/dl"). Pl.Ex. 19. On July 28, 1993, at the age of 16 months, his blood lead level was 30 $\mu$g/dl. Pl.Ex. 4.

While the March reading was elevated, it was not high enough to trigger intervention by the City. The July reading required a response on the City's part. Spe-

cifically, under the New York City Health Code, a blood lead level above 10 $\mu$g/dl in a child is considered lead poisoning. *See* New York, NY, Health Code, Title II, § 11.03. When a physician detects a blood lead level above 10 $\mu$g/dl in an individual, he or she is required to report that finding to the City's Department of Health ("DOH"). *Id.* Where a level over 20 $\mu$g/dl is reported to DOH, DOH is mandated to respond by inspecting the individual's apartment for lead paint. (Tr. 243–46); *see also* New York, NY, Health Code, Title IV, § 173.13(d)(2). Lutheran Medical Center reported Christian's blood lead level, and upon receiving this information, DOH sent two Public Health Sanitarians ("PHS") to the family's apartment on August 25, 1993 to inspect for lead paint and to advise Ms. Franco about the hazards of lead paint. (Tr. 276).

The PHSs took 78 readings of the paint and one of the tap water. The tap water sample was negative,[1] but 56 of the 78 paint readings were positive for lead paint. Pl.Ex. 10. As a result of these positive paint readings, the PHSs gave Ms. Franco a single page document, in English on one side and Spanish on the other, containing information about the steps that the City would take in attempting to remedy the lead paint hazard in her apartment. The procedure, as outlined in this informational sheet, was as follows:

1. Your landlord will be informed by letter that he/she is required by law to fix your apartment within [10] working days of notification.[2]

2. If the landlord does *not* fix your home, the New York City Emergency Repair Program (ERP) will contract to do the work and bill the landlord for the cost of repairs.

---

1. The reading was less than .005 parts per million, a level that is considered safe for consumption. (Tr. 249).

2. Oddly, the Spanish portion of the document provided for ten working days in order to

repair, but the English portion provided for five working days. (Tr. 72–73). Because Ms. Franco primarily speaks Spanish, ten days will be used here.

3. You *must* allow the landlord or the ERP to come into your home in order to do the repairs.

4. The landlord cannot dispossess you or force you to move because of these violations.

5. I will continue to check your home until the repairs are completed properly as required by the New York City Department of Health.

6. A public Health Advisor from the Bureau of Lead Poisoning will also be visiting your home to answer your questions about lead poisoning and the medical care you may expect for your child.

Pl.Ex. 10, p. 3. In addition, the PHSs put red "LEAD PAINT" stamps on surfaces found to contain lead paint.

DOH sent an Order to Abate Nuisance, dated September 16, 1993, to the Lees directing them to repair the 56 surfaces which tested positive for lead-based paint. Pl.Ex. 10, p. 15. The Order to Abate Nuisance warned the Lees that the lead paint covered surfaces in the apartment "constitute a nuisance in that they present a danger to the life or health of the child/children of the above-referenced premises." *Id.* In September or October of 1993, the Lees used plywood to cover some surfaces, but it appears undisputed that this was not a substantial abatement of the hazard. (Tr. 60–61, 112). The plywood only covered the walls in the living room and hall, and none of the door frames, window frames or any surface in the other rooms in the apartment. (Tr. 135).

As promised, over the next two months DOH continued to visit the apartment, but no significant repair work was completed. DOH sent one or more PHSs to inspect the apartment on September 27, 1993, October 19, 1993, and November 10, 1993. Although on the previous visits the PHSs had determined that work on the apartment was in progress, on the November 10th visit, the PHS decided that the Lees were no longer making an effort to repair the hazard. (Tr. 264). Consequently, the inspector determined that, consistent with the information provided to Ms. Franco upon the first visit, the apartment should be abated by the Emergency Repair Program ("ERP"). (Tr. 264). Upon the PHS's recommendation, DOH sent a letter to ERP, dated November 22, 1993, ordering that agency to abate the hazard. Pl.Ex. 10, p. 24.

Ms. Franco was never notified of this decision, (Tr. 265); indeed, at no point was there any communication between the family and ERP. ERP did not come in to repair the premises as scheduled, and at trial, the City offered no evidence as to why no repairs were completed beyond noting that there was a "lapse." (Tr. 268).[3]

On February 16, 1995, a full fifteen months since the last PHS visit, a PHS returned and found that the lead hazard in the apartment remained unabated. One or more PHSs again visited on March 8, 1995, March 30, 1995, May 11, 1995, July 17, 1995, September 28, 1995, and on October 2, 1995. Throughout this period, no repairs were made to abate the lead paint. In fact, despite DOH's significant intervention in the matter, its September 16, 1993 Order to Abate was not fully complied with until June of 1996, some eight months after Christian and his family moved out. Pl.Ex. 10 (Report of Inspection, dated June 28, 1996).

In addition to the visits by PHSs relating to monitoring the abatement, the Department of Health on four occasions stretched over a two year period sent Public Health Advisors ("PHA") to counsel Ms. Franco. A PHA visited on August 26,

---

**3.** Although the City's witness also referred to a prioritization of households based on the seriousness of the case, (Tr. 279–80), no evidence was presented as to what priority the apartment in the present case was given or as to whether there were a substantial number of households with a higher priority awaiting abatement. Nor did the City expressly argue that this was the reason for the delay.

1993, May 2, 1994, November 22, 1994, and August 30, 1995. Pl.Ex. 10. On each of these visits, the respective PHAs advised Ms. Franco on several topics, including what to feed Christian, how and when to wash Christian, Christian's continued blood testing, and how to clean the apartment and Christian's toys. (Tr. 56–58, 105); *see also* Pl.Ex. 10 (PHA notes, dated 8/26/93, 5/2/94, 11/22/94, and 8/30/95). It is undisputed that Ms. Franco consistently followed this advice. (Tr. 58).

Christian's pediatrician at Lutheran Medical Center was also involved with Christian's care. She provided Ms. Franco with vitamins (primarily iron), and advised Ms. Franco to give Christian milk. (Tr. 94–95). In addition, on August 23, 1993, Christian's first visit to the pediatrician after a dangerously high level of lead was detected in his blood, the doctor advised Ms. Franco that one source of the lead in Christian's blood could be paint from the apartment. (Tr. 99). Beyond this advice, however, the pediatrician did not instruct Ms. Franco on how and when to clean Christian or the apartment, or what diet—beyond drinking milk—Christian should follow. (Tr. 98–101).

While acknowledging that she knew the lead paint to be a continued hazard, (Tr. 88, 109), Ms. Franco believed that as long as she followed the advice of the PHAs and PHSs, Christian's health would not be in jeopardy. (Tr. 71–72). At no time did any PHS or PHA advise Ms. Franco to remove Christian from the apartment despite the fact that DOH was aware that he continued to be exposed to a lead hazard for over two years. (Tr. 59–63). Nor did anyone advise Ms. Franco that the cleaning and diet instructions she was receiving would not fully protect Christian from the lead paint hazard. (Tr. 59–63). In fact, the first indication that anyone advised Ms. Franco that Christian risked continued lead poisoning even if she followed

their advice was August 30, 1995–two years after the initial contact between Ms. Franco and DOH. (Tr. 281).[4] Further, no PHS or PHA explained to Ms. Franco that blood lead levels under 30 μg/dl could be dangerous to the child's health. (Tr. 79). Ms. Franco testified that if the above advice had been given, she would have moved from the apartment. (Tr. 72). In light of the fact that it is undisputed that Ms. Franco was a diligent and conscientious mother who followed the advice she was given, there is no reason not to credit this testimony.

In November of 1995, when Christian was approximately three and one-half years old, the family moved to a new residence in Ridgewood, Queens. In the relevant time frame—from when Christian was first found to have a high blood lead level (July 23, 1993) to when the family moved (November of 1995)—Christian's blood lead level was tested twelve times, with the following results:

| Date | Blood Lead Level μg/Dl |
| --- | --- |
| 7/20/1993 | 30 |
| 8/23/1993 | 19 |
| 11/08/1993 | 15 |
| 2/10/1994 | 13 |
| 5/17/1994 | 12 |
| 10/31/1994 | 11 |
| 4/26/1995 | 12 |
| 6/26/1995 | 17 |
| 8/1/1995 | 15 |
| 8/4/1995 | 15 |
| 10/16/1995 | 12 |
| 11/7/1995 | 12 |

Pl.Ex. 19. On June 10, 1996, approximately six months after Christian and his family moved from the apartment to Queens, his blood was tested again and his blood lead level was 6 μg/Dl. Pl.Ex. 18.

**(2)**

Christian attended a Head Start program from September of 1996 to July of 1997. Throughout this program, Christian had behavioral problems, including aggres-

---

4. At that point, Ms. Franco had already decided to move for other reasons, and was already looking for a new apartment. (Tr. 117).

siveness, inattentiveness, and restlessness. (Tr. 302); Pl.Ex. 6.

In September of 1997 Christian attended Public School 1K ("PS 1K") as a first grader. After some difficulties in the first grade recognizing letters and numbers, he attended summer school for reading. (Tr. 82–83). In second grade at PS 1K, his academic difficulties continued, especially in math and reading, (Tr. 320–22), despite the fact that his father and older sister would help him with his work every day for one to three hours. (Tr. 82–84).

These difficulties were exacerbated by Christian's behavior in school. On his second grade report card, his teachers referenced his classroom behavior and his inability to obey rules or exhibit self-control as contributing to his poor performance. Pl.Ex. 8; (Tr. 320–22). As a result of his poor grades, at the end of his second school year, in June of 1999, the school asked Christian to repeat the second grade. (Tr. 84).

### (3)

Christian's condition was evaluated twice in connection with this trial. The first evaluation was performed by plaintiff's expert, Dr. David Freyre, a licensed psychologist, on May 15, 1998, when Christian was six years old. (Tr. 147, 154). The second evaluation was performed by the City's expert, Dr. David Masur, a neuropsychologist, on August 7, 1998. (Tr. 511). Dr. Freyre conducted five tests, the Bender–Gestalt test, the Wechsler Intelligence Scale for Children ("WISC"), the Thematic Apperception Test ("TAT"), the Rorschach Inkblot Test, and a figure drawings test. Pl.Ex. 12. Dr. Masur administered the Wechsler Preschool and Primary Scale of Intelligence (the "Wechsler Preschool"), the Beery Developmental Test of Visual/Motor Integration (the "Beery Test"), the Peabody Picture Vocabulary Test, the Children's Selective Reminding Test, a figures drawings test, and a lateral dominance test. The results of the extensive battery of tests performed by each expert were essentially in agreement, and, in fact, Dr. Masur did not dispute any of the findings of Dr. Freyre. (Tr. 529).

During their respective examinations, both Dr. Freyre and Dr. Masur found Christian to be aggressive, impulsive, hyperactive and distractible. (Tr. 158–59, 513–14, 518–19).[5] Although Christian was able to complete the tests for Dr. Freyre, he threatened to quit, hid under the table, and stood on chairs on several occasions. (Tr. 158–59). Similarly, Dr. Masur found that Christian's lack of focus and inattention affected his ability to perform on certain aspects of his testing. (Tr. 514).

The first test Dr. Freyre used to evaluate Christian was the Bender–Gestalt test. The Bender–Gestalt test measures the ability of the child to rotate two-dimensional geometric figures in space. (Tr. 165). Dr. Freyre found Christian to be "impaired" in his ability on this test, a condition known as two-dimensional constructional apraxia, which would lead to difficulties in learning to read and write. (Tr. 165). He also found that Christian's visual memory was impaired. The combination of these problems led Dr. Freyre to conclude that Christian likely suffers from a language-related learning disorder. (Tr. 165–67). Because reading and writing are related to two-dimensional shapes, Dr. Freyre's conclusion that Christian has two-dimensional constructional apraxia was bolstered by the fact that Christian did not have the same difficulties with the three-dimensional figures on the WISC test. (Tr. 184). Dr. Masur did not dispute any of these findings, and in fact

---

**5.** Dr. Freyre also noted that Christian had encropesis, an ailment related to lack of bowel control, but the plaintiff's own expert conceded that there is no study linking this injury to lead poisoning. (Tr. 407–08). Although there was some testimony that this condition is related to Christian's iron supplements, there is not sufficient evidence to support a finding of causation for this injury. As a result, it will not be considered in this opinion.

similarly found that Christian had great difficulty on the Beery Test in dealing with simple two-dimensional shapes. (Tr. 521–22, 529–30).

Christian also struggled with portions of the WISC and the Wechsler Preschool tests. Both of these tests are intelligence tests that are divided into three parts: verbal, performance, and full scale. (Tr. 169). Thus, the child is given a "verbal IQ" score, a "performance IQ" score, and a "full scale IQ" score—which is a combination of his results. As measured by Dr. Freyre, Christian's full scale IQ was an 87, but there was great disparity between the verbal IQ, which was an 82, and the performance IQ, which was a 95. (Tr. 174–75). Dr. Freyre read this disparity to be further indication of a language-related learning disorder—a determination that was further supported by Christian's primitive drawings on the figure drawing test. (Tr. 175–76, 193–94).

Dr. Masur came to similar conclusions about Christian's intelligence using the Wechsler Preschool, including the disparity between verbal and performance. The doctor found that Christian's verbal IQ was an 80, and although he measured Christian's performance IQ as 81, he felt that Christian was not performing to the best of his abilities and that Dr. Freyre's result was probably more accurate. (Tr. 514–15). In fact, Dr. Masur agreed that Christian has a language-related learning disorder. (Tr. 515–16).

Dr. Freyre also found that Christian's score on the arithmetic portion of the WISC test, a 4 out of 19, was indicative of dyscalculia, a learning disorder related to a child's ability to do mathematics. (Tr. 178). Dr. Masur found Christian's mathe-

matical skills to be somewhat better, placing him in the 23rd percentile. (Tr. 534–35). Even on Dr. Masur's tests, however, Christian was often unable to perform even the simplest of mathematical tasks-such as adding 2 plus 1 or counting eight fingers. (Tr. 534–35). On the whole, it is apparent that Christian's mathematical abilities are substantially impaired.

Dr. Freyre also administered two tests, the TAT and the Rorschach, to measure Christian's mood. (Tr. 191–92). The combination of these two tests revealed that Christian is an unhappy child, but that this mental state did not rise to the level of a "thought disorder," such as insanity. (Tr. 192).

In sum, based on all of these tests, the evidence shows that Christian has dyscalculia, two-dimensional constructional apraxia, visual memory impairment, and a language-related learning disorder.[6] Dr. Freyre found, and Dr. Masur did not seriously dispute, that Christian's condition was symptomatic of a central nervous system dysfunction. Pl.Ex. 12. These various problems, combined with his behavioral problems, are the cause of his difficulties at school.[7] On the other hand, both experts agree that with remediation, counseling and tutoring, Christian could potentially catch up on his deficits. (Tr. 201, 517–18).

(4)

Plaintiff commenced this action on May 8, 1997 by filing a complaint in the Supreme Court of the State of New York, Kings County. Defendants Sung M. Lee and Shiu Chun Lee failed to answer the complaint, and plaintiffs obtained a default judgment against them.

---

**6.** Dr. Freyre also diagnosed Christian with Attention Deficit Hyperactivity Disorder. (Tr. 202). Because the doctor followed neither the diagnostic procedure prescribed in the DSM IV nor the procedure recommended by the American Academy of Pediatrics, and provided no support for his method of diagnosis, there is insufficient evidence to support this diagnosis. (Tr. 210–11, 220–25, 232).

**7.** Dr. Freyre also expressed concern that, because of his behavioral problems, Christian may end up in prison. (Tr. 201, 204–05). To the extent that this was intended to be an expert opinion—which is not clear—there is insufficient evidence to support the proposition.

After removing to this Court, the City moved for summary judgment as to all counts. Plaintiff voluntarily withdrew three causes of action as against the City, and summary judgment was granted as to four others. *See Valencia v. Lee*, 55 F.Supp.2d 122 (E.D.N.Y.1999).[8] The only claim remaining is that the City had created a special relationship with Christian, and had breached its duty to use due care with respect to his health.

## Discussion

### (1)

### Special Relationship

■ The City is not normally liable for failing to properly fulfill its duties to the general public. The New York Court of Appeals has carved out an exception to this rule, however, where the City creates a "special relationship" with the plaintiff. *See Kenavan v. City of New York*, 70 N.Y.2d 558, 568, 523 N.Y.S.2d 60, 64, 517 N.E.2d 872 (1987); *O'Connor v. City of New York*, 58 N.Y.2d 184, 192, 460 N.Y.S.2d 485, 488, 447 N.E.2d 33 (1983). This "special relationship" can be established in one of three ways: (1) where the City "violated a duty commanded by a statute enacted for the special benefit of particular persons;" (2) where the City "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby;" or (3) where the City "assume[d] positive direction and control under circumstances in which a known, blatant and dangerous safety violation exist[ed]." *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 261–62, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717 (1983).

Once such a "special relationship" is created, the City is under an obligation to act reasonably, and will be liable where its actions fail to meet that standard. *Sorichetti v. City of New York*, 65 N.Y.2d 461, 470, 492 N.Y.S.2d 591, 597, 482 N.E.2d 70 (1985); *see also Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1056 (2d Cir.1990).

### a. First *Garrett* "Special Relationship" Category

■ As recognized at the summary judgment stage, the weight of authority to have addressed the problem has found that the first category is not applicable in the present case. *See Valencia*, 55 F.Supp.2d at 129–130. Under New York City Health Code § 173.13(d)(2), the DOH is required to "order the removal of [lead-based] paint" when it is put on notice that lead paint of a certain content is present in an apartment and "the blood-lead level of any person residing in such dwelling is 20 micrograms per deciliter or higher." New York, NY, Health Code, Title IV, § 173.13(d)(2) (as written prior to 1997). While the city did fail to enforce § 173.13 by failing to abate the hazard, the courts to have addressed this issue to date have held that the statute, as it was written prior to 1997, was for the benefit all citizens, not for the "special benefit" of a "particular class" of persons, such as children. *Davis v. Owens*, 259 A.D.2d 272, 686 N.Y.S.2d 31 (1st Dept.1999) (holding that § 173.13 benefits general public, not specific plaintiffs, and, therefore, does not create special relationship); *Lindsay v. New York City Housing Auth.*, No. 95–CV–3315, 1999 WL 104599, at *8

**8.** It should be noted that the City had argued that the complaint was time-barred because the plaintiff, having retained an attorney, was not entitled to tolling due to infancy. The Second Department's decision in *Henry v. City of New York*, 244 A.D.2d 93, 676 N.Y.S.2d 616 (2d Dept.1998) squarely supported defendant's argument at the time, while the First Department, in *Rosado v. Langsam Property Serv. Corp.*, 251 A.D.2d 258, 675 N.Y.S.2d 53 (1st Dept.1998), came to the opposite conclusion. Shortly after summary judgment was denied on this issue in the present case, the New York Court of Appeals reversed the Second Department, finding that tolling due to infancy was appropriate even where the infant had retained an attorney through his or her guardian. *Henry v. City of New York*, 94 N.Y.2d 275, 702 N.Y.S.2d 580, 724 N.E.2d 372 (1999). Consequently, my previous holding that the statute of limitations was tolled by the plaintiff's infancy is in accord with New York law, and need not be revisited.

(E.D.N.Y. Feb. 24, 1999) ("[§ 173.13] was created for the benefit of all residents of New York City who live in a dwelling and not for the special benefit of children."). The New York Court of Appeals has not addressed this issue, and there is reason to believe that it could resolve it differently in light of the fact that—under the current version of § 173(d)(2)—the City's intervention is triggered upon finding a blood lead level over 20 μg/dl in "a child under the age of 18." New York, NY, Health Code, Title IV, § 173.13(d)(2) (as amended, effective January 1, 1997). However, in light of the text of the statute prior to 1997 and the absence of any authority to the contrary, the First Department's holding in *Davis* dictates that § 173(d)(2) was designed to protect the general public. Accordingly, the first category of "special relationship" does not apply to § 173(d)(2) as it was written at the time, and the plaintiff must establish such a relationship in one of the two remaining categories.

### b. Second *Garrett* "Special Relationship" Category

■ Under the second category, the City can be held liable where it "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby." *Garrett*, 58 N.Y.2d at 261–62, 460 N.Y.S.2d at 778, 447 N.E.2d 717. In order to establish this type of special relationship, the plaintiff must show: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Cuffy v. City of New York*, 69 N.Y.2d 255, 260, 513 N.Y.S.2d 372, 375, 505 N.E.2d 937, 940 (1987).

The first element—the assumption of a voluntary duty—is met where the City

"exceed[s] its general duty of inspection and abatement." *Bargy v. Sienkiewicz*, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (3d Dept.1994) (citing *Florence v. Goldberg*, 44 N.Y.2d 189, 195–97, 404 N.Y.S.2d 583, 586–87, 375 N.E.2d 763 (1978)); *see also Thomas v. City of New York*, 180 A.D.2d 588, 580 N.Y.S.2d 1008 (1st Dept.1992); *New York City Coalition to End Lead Poisoning v. Koch*, 138 Misc.2d 188, 197, 524 N.Y.S.2d 314, 320 (Sup.Ct. N.Y. County 1987), *aff'd*, 139 A.D.2d 404, 526 N.Y.S.2d 918 (1st Dept. 1988) (holding that plaintiffs in a class action lead poisoning case seeking both injunctive relief and damages "should be given the opportunity" to demonstrate a "special relationship" between the plaintiffs and the City at trial). In *Bargy*, for example, after the plaintiff's children were diagnosed with lead poisoning, the plaintiff was notified to vacate her apartment so it could be abated. A county health services employee subsequently informed the plaintiff that it was safe to return to her apartment, and she did so. The hazard had not been abated, however, and several months later one of plaintiff's sons again tested positive for lead poisoning. Plaintiffs again moved out of the apartment, and returned upon the assurance of the same county employee that the lead nuisance had been abated. When her child again tested positive for lead poisoning, and inspection of the apartment revealed that high levels of lead in paint on window sills, plaintiffs permanently vacated the apartment. The Third Department concluded that the county "may have voluntarily assumed a particular duty to use due care for the benefit of the infants ... to protect them from lead poisoning," which infant plaintiff relied upon to his detriment. *Bargy*, 207 A.D.2d at 609, 615 N.Y.S.2d at 522.

■ Here, too, through its promises and actions, the City voluntarily assumed a duty to protect Christian from harm resulting from lead poisoning. To be sure, not all of the City's actions in this case

were voluntary. The City was under a statutory obligation to order the Lees to abate the lead paint hazard within five days. Further, if the Lees failed to comply, the City was under a subsequent obligation to order the Department of Housing Preservation and Development to abate the nuisance itself. Thus, by taking those actions, the City was not voluntarily assuming any duty.

That is not where DOH's involvement in this matter ceased, however. The City was under no legal obligation, statutory or otherwise, to counsel Christian's mother on diet, cleaning or any other preventive measures. Notwithstanding this fact, DOH took on such a role. PHSs visited the apartment ten times between August 25, 1993 and September 28, 1995, and documented a continuing threat from lead paint to infant plaintiff's health and life. Beyond mere inspection, however, these PHSs also advised Ms. Franco on the hazards of lead poisoning. Moreover, during the same period, on four occasions, one or more PHAs visited the apartment and advised Christian's mother on proper diet and nutrition, proper cleaning of the infant, proper cleaning of the apartment, and other related preventative measures. Because none of this advice or counseling was mandated by any statute or ordinance, it was a "voluntarily assumed" duty, thus constituting the first element of a "special relationship."

The City counters by arguing that the DOH's actions in counseling and educating Christian's mother were not "voluntarily assumed" because such a duty is mandated by § 1370–a of New York Public Health Law. See N.Y. Pub. Health Law § 1370–a (McKinney's Supp.2000). Enacted in April of 1993, section 1370–a mandates that DOH shall "establish a lead poisoning prevention program" that will "minimize risk of exposure to lead." Id. at § 1370 a(1). More specifically, the statute requires DOH to:

(a) promulgate and enforce regulations for screening children and pregnant women for lead poisoning, and for follow up of children and pregnant women who have elevated blood lead levels;

(b) enter into interagency agreements to coordinate lead poisoning prevention, exposure reduction, identification and treatment activities and lead reduction activities with other federal, state and local agencies and programs;

(c) establish a statewide registry of children with elevated lead levels . . .;

(d) develop and implement public education and community outreach programs on lead exposure, detection and risk reduction.

Id. at § 1370–a(2).

The City's reliance on this statute is misplaced. The statute does not require the type of counseling and advice given in the present case. The fact that the City is under a general obligation to implement lead poisoning prevention programs does not render "involuntary" all specific tasks undertaken that relate to lead poisoning. For example, in Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978), the New York Court of Appeals held that the City could be found liable for injuries a child suffered when he was hit by a car on the way home from school. The City had provided a crossing guard at the intersection every day of the school year, but failed to do so on the day in question. Id. at 192–94, 404 N.Y.S.2d at 584–85, 375 N.E.2d 763. The court recognized that providing a crossing guard fell within the general duty of the police to control pedestrian and vehicle traffic, but nonetheless held that liability of the City was warranted because the police had voluntarily assumed the specific duty of providing officers to act as crossing guards and had been negligent in failing to provide a guard on that day. Id. at 196–98, 404 N.Y.S.2d at 587–88, 375 N.E.2d 763.

The only duties created by § 1370–a are duties upon the DOH to implement various programs or policies. By its terms, the statute does not require the City to give

advice to people inhabiting apartments with lead paint. In other words, the obligation imposed by this section is, at most, a general obligation to create programs and implement them. If statutes or ordinances had been enacted pursuant to § 1370–a requiring DOH to counsel people exposed to lead paint on diet and cleaning, then perhaps the City would have a better position. The City makes no such claim. Furthermore, in light of the fact that § 1370–a was enacted only a few months before Christian's ordeal began, it is highly improbable that any of the actions taken by the City in this case were mandated by legislation enacted pursuant to § 1370–a. In any event, the City has provided no evidence to that effect, and absent some showing of an affirmative obligation to give diet and cleaning advice to inhabitants of apartments found to contain lead paint, the City was acting voluntarily in this case. Put another way, if the City had not advised and counseled Ms. Franco, they would not have been acting in contravention of § 1370–a, or any other statute or ordinance.

Moreover, to whatever extent § 1370–a could be read to impose an obligation on DOH to counsel individually citizens exposed to lead paint, the statute itself would still create a "special relationship." Subsections (b), (c) and (d) quite clearly create no obligations like counseling. Subsection (a) requires that DOH "promulgate and enforce regulations ... for follow up of children and pregnant women who have elevated blood lead levels," which arguably could include counseling. See N.Y. Pub. Health Law § 1370–a(2)(a) (McKinney's Supp.2000). However, that subsection is specifically and expressly enacted for the benefit of two classes of citizens—children and pregnant women. Id. Because Christian was a member of the special class whom the statute was designed to protect, this section—if it imposes a duty at all— simultaneously creates a "special relationship" because it is a statute "enacted for the special benefit of particular persons." Garrett, 58 N.Y.2d at 261–62, 460 N.Y.S.2d at 778, 447 N.E.2d 717. Consequently, whatever duty the City claims is mandatory under that section would nonetheless create a "special relationship" in this case because the statute was enacted for the benefit of children, and the specific injury which the statute sought to avoid resulted. See, e.g., Van Gaasbeck v. Webatuck Cent. Sch. Dist., 21 N.Y.2d 239, 287 N.Y.S.2d 77, 234 N.E.2d 243 (1967) (school district liable where bus driver violated statute designed to protect children riding school buses, and injury to child resulted); Chapin v. City of White Plains, 104 A.D.2d 785, 480 N.Y.S.2d 129 (2d Dept.1984) (affirming denial of city's summary judgment motion because city may be liable for failure to enforce a statute designed to protect certain class of motorists).

In sum, by taking the above actions, the City voluntarily assumed a duty above and beyond what was required of it by any statute. The duty so assumed was a duty to use due care in protecting Christian from dangerous exposure to lead. Thus, the first element in creating a "special relationship" has been met in this case.

The second element in establishing a "special relationship"—that the City's agents knew that harm could result from their action or inaction—is also met in this case. There can be no dispute that the City's agents knew that continued exposure to lead paint could lead to harm to Christian, and indeed the City does not dispute this fact. See Def. Pre–Trial Mem., p. 2–5. Moreover, it is not disputed that lead paint is currently a leading cause of elevated lead levels in children, and that the reason the PHSs and PHAs were sent to the apartment was that Christian had already been found to have an elevated blood lead level. Under these circumstances, there is no difficulty finding that the various PHSs and PHAs that visited the apartment knew that continued exposure to lead paint for the more than two years that elapsed between the City's involvement and when the family moved

from the apartment created a threat to Christian's health. Consequently, they must have known that failing to properly or thoroughly advise Ms. Franco on how act under the circumstances could potentially lead to harm to Christian.

The third element in establishing a "special relationship," that there be some direct contact between the City's agents and the plaintiff, is also easily satisfied here. The City does not contest that Christian and his mother were visited and advised by DOH agents on more than ten occasions, and apparently does not contest that this element has been satisfied as a result. *See* Def. Pre–Trial Mem., p. 2–5. Indeed, it is the advice given during many of these "contacts" that is the source of the current dispute. The fact that the contact was primarily with Ms. Franco, not the infant plaintiff, does not affect this issue because where the plaintiff is an infant, contact with that infant's parents suffices to meet this element. *See Sorichetti*, 65 N.Y.2d at 469, 492 N.Y.S.2d at 596, 482 N.E.2d 70 (finding that contact between police and mother of 6½ year old plaintiff sufficed to meet "contact" element in suit against the City).

The most difficult element of the "special relationship" in this case is the fourth—that Christian's mother justifiably relied upon the advice given to her by the various DOH personnel. *See Cuffy*, 69 N.Y.2d at 261, 513 N.Y.S.2d at 375, 505 N.E.2d 937. The New York Court of Appeals has recognized that reliance is critical because it "provides the essential causative link between the 'special duty' assumed by the municipality and the alleged injury." *Id.* The question presented in this case is whether Ms. Franco's failure to move her son from the apartment at an earlier date was the result of her justifiably relying on the advice given to her by the PHAs and PHSs, and her un-

derstanding that this advice was adequate to protect Christian's health.[9]

The City's argument that Ms. Franco did not justifiably rely on the advice given by DOH agents is primarily founded on their contention that Ms. Franco knew of the ongoing lead hazard in the apartment, and thus could not have justifiably relied on the advice of the PHSs and PHA. This argument focuses on various actions and statements by Ms. Franco during the relevant time frame which the City argues show her knowledge that Christian continued to be in danger despite the precautions she took at the advice of the PHAs and PHSs. As a result of her appreciation of the risk, the argument goes, she cannot show that the City "lulled [her] into a false sense of security and has thereby induced [her] either to relax [her] own vigilance or to forego other available avenues of protection." *See Cuffy*, 69 N.Y.2d at 261, 513 N.Y.S.2d at 375, 505 N.E.2d 937.

Specifically, the City argues that certain events show that Ms. Franco was quite aware of the ongoing risk:

1. The PHS placed red "lead paint" stamps throughout the apartment, and Ms. Franco knew that they indicated that there was an ongoing lead hazard in the apartment.

2. Ms. Franco retained legal counsel to represent her against the City approximately five weeks after the initial inspection of the apartment.

3. Ms. Franco filed a Notice of Claim against the city on March 28, 1994, which alleged that Christian was still being exposed to lead.

4. On July 21, 1994, Ms. Franco testified about the ongoing threat in the apartment, and that she had seen Christian eat paint chips before and knew it was the source of the lead.

Def. Pre Trial Mem., p. 3–4.

The City primarily relies on the New York Court of Appeals decision in *Cuffy* to

---

9. Where the injured party is an infant, the New York Court of Appeals has considered both contact with the infant's mother and reliance by the infant's mother as the relevant

issues in determining whether a "special relationship" exists. *See Sorichetti*, 65 N.Y.2d at 468–71, 492 N.Y.S.2d at 595–97.

support its position. Joseph and Eleanor Cuffy, owners and occupants of a two-family house, found themselves in a dispute with their tenants, Joel and Barbara Aitkins. *Cuffy,* 69 N.Y.2d at 258–59, 513 N.Y.S.2d at 373–74, 505 N.E.2d 937. After several arguments which led to police intervention and a failed attempt at arbitration, the dispute escalated to the point of physical violence when Joel Aitkins attacked Eleanor Cuffy. A police officer familiar with the ongoing dispute responded but elected not to take action, finding that the offense did not warrant an arrest. Joseph Cuffy, not satisfied with this lack of action by the police, went to the precinct, telling the desk officer that if the police did not make an arrest that night, the Cuffy family would have to move out. After being assured that an arrest would be made by the following morning, Joseph Cuffy returned home. *Id.* The police took no action, and the following evening another dispute arose wherein Joel and Barbara Aitkins assaulted Eleanor Cuffy and two of her children with a baseball bat and knife. *Id.* at 259–60, 513 N.Y.S.2d at 374, 505 N.E.2d 937.

A jury awarded the Cuffy family substantial damages against the City, and the City appealed. The Appellate Division affirmed, and the City appealed to the New York Court of Appeals. After dismissing one of the plaintiffs because he had no direct contact with the police and was not a member of the household, the court found that the remaining plaintiffs had not established a justified reliance on the promise of the desk officer that an arrest would be made by the next morning. *Id.* at 262–63, 513 N.Y.S.2d 372, 505 N.E.2d 937. The Court of Appeals pointed out that the attack occurred the following evening, and the police had promised that an arrest would be made that morning; because no action was taken when it was promised, the plaintiffs knew or should have known that the promised police action was not forthcoming. *Id.* Thus, the court held that the plaintiffs' continued presence in the house despite knowing that the police had failed to keep their promise rendered any continued reliance on that promise unreasonable and unjustified. Accordingly, the court held that no "special relationship" existed.

The present case is quite distinguishable from *Cuffy* because of the nature of the City's involvement. Ms. Franco concedes that she knew that lead paint was a hazard, and she knew that the abatement was not complete so that hazard remained. This is precisely why she relied upon the advice of the PHAs and PHSs—she needed to know how to keep Christian safe despite the ongoing threat. The City's agents advised her on proper cleaning and diet, which ostensibly would protect Christian, and she followed that advice. Because she was getting no cleaning advice from any other source, and only limited advice on diet from Lutheran Medical Center, she relied on the advice given to her by the City's agents. Unlike the family in *Cuffy,* Ms. Franco did not know, and had no reason to know, that the advice she had been given was faulty. Therefore, it was the continuing advice and counseling by the City's agents that "lulled" Ms. Franco into a false sense of security, allowing her to believe that her son was protected so long as she followed that advice. Not until August 30, 1995, two years after their involvement began and after Ms. Franco had already begun looking for a new apartment, did DOH inform Ms. Franco that she would be better served by removing Christian from the apartment. Pl.Ex. 10 (PHA report dated 8/30/1995); (Tr. 117).

The plaintiffs in *Cuffy,* on the other hand, knew that the promise that they had received had not been honored, and that they were not being protected from the threat. To be sure, Ms. Franco knew that the city failed to honor its promise to abate the hazard itself, but it is not this inaction which provides the foundation for her complaint. It is the advice and counseling that Ms. Franco continued to receive—which she believed to be reliable—that allowed

Christian to continue to be injured. It is this action by the City, and the alleged failure to reasonably and fully perform this action, that provides the basis for finding that a special relationship exists in the present case.

Thus, the City in the present case "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby," *Garrett*, 58 N.Y.2d at 261–62, 460 N.Y.S.2d at 778, 447 N.E.2d 717. Accordingly, a "special relationship" with the plaintiff, Christian Valencia, was created under the second category in *Garrett*. The duty created under this relationship was a duty to properly safeguard Christian from further lead poisoning.

### c. Third *Garrett* "Special Relationship" Category

██ In addition to forming the "special relationship" under the second category described in *Garrett*, the City has also created a "special relationship" under the third category. Under that category, the City would be liable if it "assume[d] positive direction and control under circumstances in which a known, blatant and dangerous safety violation exist[ed]." *Id.* In *Garrett*, the owners of a hotel alleged that the Town, despite having specific knowledge of blatant fire and safety code violations at the hotel, nevertheless issued a certificate of occupancy representing that the hotel was safe and free of violations. *Id.* at 262–63, 460 N.Y.S.2d at 778–79, 447 N.E.2d 717. The court held that liability could be imposed on the Town for injuries suffered in a fire at the hotel,

> [i]f, as is alleged in the complaints, known, blatant, and dangerous violations existed on these premises, but the town affirmatively certified the premises as safe, upon which representation appellants justifiably relied in their dealings with the premises.

*Id.* at 262, 460 N.Y.S.2d at 779, 447 N.E.2d 717. In other words, if the City knew of the hazards and affirmatively acted to allow exposure to these hazards despite this knowledge, liability could attach.

Even closer to the present case is the situation presented to the Court of Appeals in *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y.S.2d 19, 268 N.E.2d 763 (1971). In *Smullen*, a construction worker repairing a private sewer line was killed when he ventured down into a trench that had been dug to allow access to the line. The trench was over 11 feet in depth, and, in violation of city ordinances, was not shored or otherwise safeguarded to prevent it from collapsing in on itself. *Id.* at 68, 320 N.Y.S.2d 19, 268 N.E.2d 763. The worker's supervisor was not present at the time of the incident, but a city inspector was. *Id.* at 68–69, 320 N.Y.S.2d 19, 268 N.E.2d 763. As the inspector watched the worker descend into the trench, he said "it is pretty solid there" and "I don't think it needs to be shored." *Id.* at 69, 320 N.Y.S.2d 19, 268 N.E.2d 763. Contrary to the inspector's assurances, the trench caved in, and the worker was killed. *Id.* at 68, 320 N.Y.S.2d 19, 268 N.E.2d 763.

After the Appellate division set aside a verdict awarded in the case against the City, the administratrix appealed to the Court of Appeals. That court first recognized that the city inspector had the power to order that the work be stopped because of the violation of the city ordinance requiring the trench to be shored. *Id.* at 70, 320 N.Y.S.2d 19, 268 N.E.2d 763. Acknowledging, however, that the mere failure to stop the construction would not subject the City to liability, the court went on the address whether the City had created a "special relationship" with the worker. The court held that by actively telling the worker that the trench looked safe, the inspector had taken "positive action in assuming direction and control" in the face of a blatantly dangerous condition. *Id.* at 71–72, 320 N.Y.S.2d 19, 268 N.E.2d 763. Accordingly, the Court of Appeals reversed the Appellate Division and reinstated the trial court's verdict. *Id.* at 73, 320 N.Y.S.2d 19, 268 N.E.2d 763.

The present case is analogous to the situations in *Garrett* and *Smullen.* As described above, the unabated lead paint hazard in the apartment was a dangerous safety hazard of which the City was well aware. Indeed, after reviewing the file on Christian's apartment, the former borough coordinator for DOH, Alan Fast, testified that "I would say that this was a lead hazard for sure," and that he "would classify it as a serious condition." (Tr. 252). Moreover, the Order to Abate Nuisance warned that the lead paint in the apartment "presents a danger to the life or health of the child/children of the above-referenced premises." Pl.Ex. 10, p. 15. The City affirmatively took control of the situation in the presence of this known hazard by instructing Ms. Franco on how to care for the infant. Just as the City inspector in *Smullen* exposed the worker to danger by instructing him that the walls were safe, implicitly encouraging him to remain in the trench, the PHSs and PHAs exposed Christian to danger by advising Ms. Franco on how to keep her son safe, thus implying that he could be kept safe and implicitly encouraging her to remain in the apartment. In the present case, the City took positive action in the face of a known dangerous condition by giving advice, and by doing so created a special relationship with the injured party.

### d. Duty

■ Having formed a special relationship with Christian, the City was under a duty to act reasonably. *Sorichetti,* 65 N.Y.2d at 470, 492 N.Y.S.2d at 597, 482 N.E.2d 70; *see also Raucci,* 902 F.2d at 1056. The City failed to meet this standard by neglecting to give Ms. Franco the two pieces of advice that would have prevented any further injury to Christian. By failing to inform her that remaining in the apartment would leave Christian at risk even if she followed all of their advice, the City's withdrew its help just where such help was needed most. As stated by Judge Cardozo, "[t]he hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all." *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 167, 159 N.E. 896 (1928). Although the hand was not fully withdrawn in this case, it did not provide the aid necessary to prevent injury. Just as the City was liable in *Florence* for failing to provide a crossing guard where the parents were relying on the presence of that crossing guard, so would the City be liable for providing a crossing guard that only escorted children halfway across the street. Such is the case here, where the City provided PHAs and PHSs to protect Christian by advising his mother, but failed to provide all the advice necessary. Thus, the City did not act reasonably, and did not fulfil the duty which it assumed to protect Christian from further lead poisoning.

### (2)

### City's Liability

The City argues that even if such a "special relationship" was formed, and regardless of what damages were caused by the lead poisoning as a whole, it cannot be held liable because plaintiff has not proven what portion of his injuries, if any, occurred after the City became involved. Because Christian's highest blood lead level was detected prior to the attachment of the special relationship, the argument goes, the City is not liable for the portion of the damage caused by that exposure. As a result, the City claims that an assessment of liability against the City for a portion of the injuries could be based on nothing but pure speculation because there is no evidence as to how much of Christian's cognitive deficiencies and behavioral problems were caused after the City's liability attached. New York law, however, does not place the burden of making this distinction on the plaintiff; if the distinction is to be made at all, it is the defendant's burden to make it. *Ravo v. Rogatnick,* 70 N.Y.2d 305, 520 N.Y.S.2d 533, 514

N.E.2d 1104; *see also* 103 N.Y. Jur., Torts § 31.

■ The City correctly argues that it is a successive tortfeasor, not a joint tortfeasor, with respect to the injury that occurred prior to the time that the special relationship attached. Successive tortfeasors are normally liable only for the injuries caused by their individual actions, not for any injury occasioned by the actions of the initial tortfeasor. *See Suria v. Shiffman,* 67 N.Y.2d 87, 98, 499 N.Y.S.2d 913, 490 N.E.2d 832 (1986).

A difficulty arises, however, where the combination of the actions of both tortfeasors causes a single, indivisible injury. The New York Court of Appeals has addressed this question, however, and has provided a sensible solution. In *Ravo,* the infant plaintiff, Josephine Ravo, suffered brain damage during birth due to her doctor's negligence. *Ravo,* 70 N.Y.2d at 307–08, 520 N.Y.S.2d at 534, 514 N.E.2d 1104. The pediatrician who subsequently treated Josephine misdiagnosed and improperly treated the child, thereby exacerbating the injuries to her brain. *Id.* The jury assessed liability against both doctors, finding that the conduct of each was a substantial factor in causing Josephine's brain damage, and the trial court held them each jointly and severally liable for the entire injury. *Id.* at 309, 520 N.Y.S.2d at 535, 514 N.E.2d 1104.

On appeal, the pediatrician argued that he should not have been held jointly and severally liable for the initial injury caused by the obstetrician because he was a successive tortfeasor. The Court of Appeals agreed that he was a successive tortfeasor, but rejected his conclusion, holding that where "a single indivisible injury" results from the conduct of successive tortfeasors which "because of [its] nature, [is] incapable of any reasonable or practicable division," each tortfeasor is jointly and severally liable for the entire injury. *Id.* at 310–13, 520 N.Y.S.2d at 536–38, 514 N.E.2d 1104. The burden then shifts to the defendants to apportion the injury between or among themselves by proving, if possible, what portion they are or are not liable for, and seeking contribution from the others. *Id.; accord Mazyck v. Long Island Railroad Co.,* 896 F.Supp. 1330 (E.D.N.Y.1995); *Dubrey v. Champlain Valley Physicians Hosp. Med. Center,* 189 A.D.2d 950, 592 N.Y.S.2d 149 (3d Dept. 1993); *Lewis v. Yonkers Gen. Hosp.,* 174 A.D.2d 611, 571 N.Y.S.2d 94 (2d Dept. 1991); *Wiseman v. 374 Realty Corp.,* 54 A.D.2d 119, 387 N.Y.S.2d 612 (1st Dept. 1976).

■ In the present case, the City does not dispute that Christian's various injuries are indivisible. To the contrary, part and parcel of the City's argument that it cannot be held liable is that it would be mere speculation to attempt to determine what portion of the injury was caused after the "special relationship" attached. This argument is based in part on the premise that these injuries are not readily divisible, and, in fact, counsel for the City was careful to bring this point out on cross examination of the plaintiff's expert, Dr. Rosen. (Tr. 441). Thus, because the injuries in the present case are each indivisible, if Christian's exposure to lead paint after the special relationship attached was a substantial factor in causing his injuries, the City is jointly and severally liable.

The burden which the plaintiff must carry is proving that the exposure to lead paint after the City's involvement was a substantial factor in causing Christian's injuries. On this issue the City argues that there is no way to determine that Christian's continued presence in the apartment after the City's involvement had any negative effect on his lead poisoning. This argument is based on the theory that blood lead levels take a long time to diminish, and Christian's blood lead level gradually declined over the relevant two year period. (Tr. 447–51). From this, the City concludes that it is entirely possible that the advice given to Ms. Franco was sufficient to prevent further injury to Christian, and

consequently, his exposure to lead after the City's liability attached was not a substantial factor in his injuries.

This argument fails for two reasons. First, Christian's blood lead level did not gradually and consistently diminish, as one would expect under the City's theory of events. The City is correct that Christian's blood lead level was decreasing or remaining stable for the initial period of the City's involvement, reaching a low point of 11 µg/dl in October of 1994, but this does not end the inquiry. Christian's blood lead level then increased in April of 1995 to 12 µg/dl and increased in June of 1995 to 17 µg/dl, thus indicating that Christian faced continued, damaging exposure to lead during the City's involvement. Second, after Christian was removed from the apartment, his blood lead level dropped to 6 µg/dl within seven months. This stands in contrast to the fact that his blood lead level remained above 11 µg/dl for two years while he remained in the apartment after the City's involvement.

Moreover, the City's liability attached relatively early on in this case. On August 26, 1993, less than six months after a significant amount of lead was first detected in Christian's blood on March 3, 1993, the City created the special relationship by sending a PHA to advise Ms. Franco. Further, Christian started crawling at six or seven months, (Tr. 493), and prior to that time, he faced virtually no risk of lead exposure because he could not touch the walls.[10] The City's involvement continued until November of 1995, more than two years later. Thus, the City's liability covered approximately three quarters of the time in which Christian's blood lead level was elevated, and two-thirds of the time

that Christian could even have potentially been exposed to lead.

After reviewing all of this evidence, the plaintiff's expert, Dr. Rosen, concluded that Christian continued to be exposed to a lead hazard after the City's involvement, and that the continued exposure played a substantial role in the injuries from which Christian now suffers. (Tr. 389–90). The evidence amply supports this conclusion.

This evidence also distinguishes the present case from the three Appellate Division lead poisoning cases upon which the City relies. In *Jones v. Cox*, 254 A.D.2d 333, 334, 679 N.Y.S.2d 67 (2d Dept.1998), *Andrade v. Wong*, 251 A.D.2d 609, 610, 675 N.Y.S.2d 112 (2d Dept.1998), and *Brown v. Marathon Realty, Inc.*, 170 A.D.2d 426, 428, 565 N.Y.S.2d 219 (2d Dept.1991), the respective Second Department panels found that liability could not attach because the respective plaintiffs had adduced no evidence that the child continued to ingest lead, much less that the child continued to suffer from lead poisoning, after the point at which the defendants became liable. As a result, none of those panels reached the issue presented here and in *Ravo*, namely, where the conduct of the defendant was a substantial factor in causing the injury, how is the liability of that defendant determined. Unlike the plaintiffs in the three Second Department cases, the plaintiff here has provided evidence of continued exposure, and continued lead poisoning, more than two years after liability attached.[11] *See, e.g., Walker v. DiPaolo*, 270 A.D.2d 932, 706 N.Y.S.2d 654 (4th Dept.2000) (denying defendant's motion for summary judgment where evidence showed plaintiff's blood lead level remained elevated after liability attached); *General Accident Ins. Co. v. Idbar Realty*

---

**10.** This is implicit from the fact that it is undisputed that lead paint exposes children to risk through direct contact with paint dust or paint chips on surfaces in the home, not through the air. (Tr. 257).

**11.** The City also cites *Oeffler v. Miles*, 241 A.D.2d 822, 660 N.Y.S.2d 897 (3d Dept.1997),

which is not a lead poisoning case. To the extent that it stands for the proposition discussed above, it is distinguishable for the same reason-the plaintiff there, unlike the present plaintiff, offered no evidence of continued injury after liability attached.

*Corp.*, 163 Misc.2d 809, 811–12, 622 N.Y.S.2d 417, 418–19 (Sup.Ct.Suffolk Cty. 1994) (insurance carrier can be liable even where policy did not take effect until after lead poisoning began because evidence showed continued exposure and injury).

In light of all of this evidence, it is more probable than not that Christian's exposure to lead after the City's liability attached was a substantial factor in the injuries he suffered. Accordingly, the City is jointly and severally liable for all of Christian's injuries caused by lead poisoning.

### (3)

### Causation

As more fully described above, the experts for both sides agree about much of Christian's current condition. The only real issue with respect to causation, therefore, is whether Christian's cognitive deficits, learning disorders and behavioral problems were caused by lead poisoning.

The City first argues that Christian's elevated blood lead may have come from some source other than the lead paint in the apartment. The City points out that Ms. Franco is from Equador, and that Equador has a much greater problem with lead exposure than does the United States. Christian, however, was born in New York, and for over a year did not have elevated blood lead levels. In addition, Dr. Rosen credibly testified that Ms. Franco's five year residence in the United States prior to Christian's birth, along with the fact that Christian's sister has never had an elevated blood lead level, conclusively exclude Ms. Franco's place of origin as a possible source of blood lead in Christian. (Tr. 456–57).

The City also makes reference to lead in Venetian blinds or other common external sources, but does not support these hypothetical suggestions with any evidence. Moreover, after reviewing the evidence, and discussing the city environment in which Christian lived, Dr. Rosen found no other reasonably plausible source of lead. (Tr. 354, 461). Thus, none of the City's suggested other sources of lead find any support in the record, and it is more probable than not that Christian's elevated blood lead levels came from his exposure to lead paint in the apartment.

With respect to Christian's injuries, there is no dispute that Christian's exposure to lead more likely than not damaged his cognitive abilities and affected his behavior. Initially, the experts agree that Christian's overall IQ was diminished, but disagree as to what the impact of the lead poisoning would have been.[12] Because the impairments discussed below are the real source of injury and damages in this case, it is not necessary—and probably not possible—to determine exactly what Christian's overall IQ loss was. Suffice it to say that Christian suffered some damage to his cognitive abilities as a result of his lead poisoning. The issue then becomes whether lead poisoning was a substantial factor in causing the specific injuries discussed below.

Christian suffers from various linguistic and cognitive deficiencies, including a language-related learning disorder, two-dimensional constructional apraxia, and dys-

---

**12.** Plaintiff's expert, Dr. Rosen, opined that an average child with Christian's level of exposure and the duration of that exposure, would suffer a seven to ten point IQ loss. (Tr. 390). The defendant's expert, Dr. Wasserman argued that the studies show that an increase from 10 μg/dl to 30 μg/dl would only lead to a two to five point loss in IQ. (Tr. 592). Using this figure, Dr. Wasserman then testified that the lead exposure that occurred after the City became involved would only have lead to a loss of approximately one point. (Tr. 599–600). Both of these positions cannot be completely reconciled with the evidence. First, Dr. Rosen based his figure on a study of children who were iron deficient, (Tr. 390–91), but the evidence in this case is clear that Ms. Franco was very diligent in giving Christian iron supplements. On the other hand, Dr. Wasserman's assessment does not take into account the fact that the City is jointly and severally liable for the entire lead exposure. Thus, her figure of one point, based on an average blood lead level just over 13 μg/dl, is too low.

calculia (collectively, the "deficiencies"), as well as various behavioral problems. It should be noted that the deficiencies and Christian's behavioral problems are related to a certain extent. Dr. Masur, the City's psychologist, testified that there is a "high relationship" between having a language-related learning disorder and behavioral problems because the difficulties in learning make the child frustrated, anxious and agitated, and thereby cause behavioral problems. (Tr. 518–19). Thus, to a certain extent, causation of Christian's behavioral problems is furthered by the fact that Christian has undisputedly suffered some injury to his cognitive abilities.

 The causation analysis is also aided by reference to the long-established principle of New York law that where a violation of a duty exists, and an injury results which was the very injury which the duty was intended to prevent, this in and of itself creates a prima facie causal link between the action and the injury. *See Martin v. Herzog*, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.). In such a situation, "[i]f nothing else is shown to break the connection, we have a case, prima facie sufficient, of negligence contributing to the result." *Id.* at 170, 126 N.E. 814.

This principle was recently reiterated by the Second Circuit in *Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir.1999). Luis Liriano, an employee of a grocery store, was injured while operating a meat grinder manufactured by the defendant. *Id.* at 266. The meat grinder had been sent to his employer with a safety guard, but the guard had subsequently been removed. The meat grinder did not have a warning label indicating that it should only be operated with the safety guard in place, and Liriano sued the manufacturer for, *inter alia*, failure to warn. *Id.* A jury returned a verdict in favor of Liriano based on that theory, and the manufacturer appealed.

The manufacturer argued that there was no evidence that the lack of a warning

label caused Liriano's injury. The Second Circuit disagreed, reasoning that:

> the kind of negligence that the jury attributed to the defendant tends to cause exactly the kind of injury that the plaintiff suffered. Indeed, that is what the jury must have found when it ruled that Hobart's failure to warn constituted negligence. In such situations, rather than requiring the plaintiff to bring in more evidence to demonstrate that his case is of the ordinary kind, the law presumes normality and requires the defendant to adduce evidence that the case is an exception. Accordingly, in a case like this, it is up to the defendant to bring in evidence tending to rebut the strong inference, arising from the accident, that the defendant's negligence was in fact a but-for cause of the plaintiff's injury.

*Id.* (citing *Zuchowicz v. United States*, 140 F.3d 381, 388 n. 6–7 (2d Cir.1998)). Accordingly, where the injury which occurs is the type of injury that the relevant duty was meant to avoid, this is sufficient to establish a prima facie causal link, and the burden is then on the defendant to rebut it.

The City argues, relying on dicta from *Zuchowicz*, that the present case does not fall into this category of cases because the injurious effects of lead poisoning take some time to develop, and therefore the temporal link is too attenuated to find causation absent more direct evidence. *See Zuchowicz*, 140 F.3d at 390 (finding liability because, in part, "unlike many toxic torts situations, there was not a long latency period between the onset of the symptoms and the patient's exposure ..."). In *Zuchowicz*, the Second Circuit affirmed liability in a wrongful death action against a doctor who prescribed an overdose of Danocrine, despite the fact that there were no studies to support a connection between Danocrine and the particular symptoms from which the plaintiff had perished. *Id.* at 385 (noting that no studies had been done on the effects of Danocrine at the dosage in question). In

that case, therefore, the plaintiff could not provide any epidemiological support to prove causation, and the temporality was necessary to establish a causal link. *Id.* at 385–90. The court found liability based on the temporal proximity of the overdose and the death, and on the fact that expert witnesses opined that the symptoms were indicative of a drug-induced illness. *Id.* 390–91.

In the present case, the plaintiff has both the epidemiological evidence that was absent in *Zuchowicz,* and the circumstantial evidence discussed in that case, *Liriano,* and *Martin.* As more fully discussed below, the evidence is replete with epidemiological studies connecting lead poisoning to cognitive deficits and behavioral problems. The effects of lead poisoning in children, including children with blood lead levels comparable to Christian's, have been extensively studied for many years. Therefore, the temporal proximity is not as crucial as it was in *Zuchowicz* because causation has been shown by these studies despite the length of time it takes the injuries to develop.

Because this is not a case where we can document the absence of Christian's injuries prior to his lead exposure, one aspect of the causal link in *Martin, Liriano,* and *Zuchowicz* is not present. As a result, shifting the burden to the City may not be appropriate based solely on the fact that Christian has these injuries. On the other hand, considering the fact that each of the deficiencies is uncommon, and common sense dictates that having all of them together is more uncommon, it is more likely than not that Christian was not born with them. In addition, Christian's developmental milestones prior to his starting school—*e.g.* learning to crawl—were nor-

mal. (Tr. 493). These pieces of evidence combined with the limited differential etiology performed by plaintiff's expert (described below) are sufficient to create a prima facie causal link. Therefore, the City cannot be permitted to rest entirely on hypothetical speculation by its attorney and experts. Thus, if Christian's injuries are the kind of injuries caused by exposure to lead, it is appropriate to shift the burden to the City to show affirmatively that some other factor was at work in causing Christian's injuries.

All of the evidence in this case leads to the conclusion that Christian's injuries are the very type of injuries which are caused by lead exposure.[13] Lead is a toxin which is especially damaging to the brains and nervous systems of young children. Pl.Ex. 17, p. 7 (1991 statement by the Centers for Disease Control and Prevention, "Preventing Lead Poisoning in Young Children" ("CDC Statement")). Currently, the primary source of lead poisoning in children is lead paint in older apartments and houses. *Id.* Because lead has been a prevalent toxin for such a long time, members of the scientific community have conducted numerous studies concerning the effects of lead poisoning, and the results of these studies have been "remarkably consistent." Def. Ex. and Docs. That May Be Used for Impeachment ("Def. Impeachment Ex."), Ex. F (Rosen article); (Tr. 591) (City expert Dr. Wasserman agreeing that results of studies are "very comparable").

In 1991, as a result of the studies available at the time, the CDC lowered the blood lead level considered to be lead poisoning from 25 $\mu$g/Dl to 10 $\mu$g/Dl. This move was prompted by "a large number of rigorous epidemiologic and experimental studies," the majority of which found asso-

---

**13.** Indeed, New York courts have not been hesitant to allow awards compensating cognitive deficiencies, learning disorders and behavioral problems caused by lead poisoning. *See, e.g., Hiraldo v. Khan,* 267 A.D.2d 205, 699 N.Y.S.2d 456 (2d Dept.1999) (finding award of $500,000 for pain and suffering resulting from hyperactivity and learning problems and

memory difficulties caused by lead poisoning was appropriate on remittitur); *Miller v. Beaugrand,* 169 A.D.2d 537, 564 N.Y.S.2d 390 (1st Dept.1991) (reinstating $1.7 million award against landlord and city for behavioral problems, visual processing, learning disabilities).

ciations between blood levels "well below 25 µg/dl" and negative neurological effects in children. *Id.*, p. 9.

Since 1991, our understanding has only improved. In 1997, the United States Department of Housing and Urban Development, Office of Lead Hazard Control, released a report on lead poisoning to Congress entitled "Moving Toward a Lead–Safe America" (the "HUD Report"). Pl.Ex. 16. The HUD Report recognized that lead's effect on neurological development and behavior was "of greatest concern." *Id.* at 41. In addition, it recognized that about a dozen different studies showed "declines in intelligence, regardless of whether or not exposures were high or low." *Id.* (citations to studies omitted). The HUD report also recognized that at least five studies have linked lead exposure to "anti-social behavior, juvenile delinquency and adult criminality." *Id.* at 42.

An evaluation of some of these studies confirms that the specific impairments from which Christian suffers are consistently linked to lead exposure. For example, the City's own expert, Dr. Gail Wasserman, was co-author of a study in Yugoslavia which studied the effect of lead exposure on cognitive development in children through age 4, as measured by the McCarthy Scales of Children's Abilities ("MSCA"). Pl. Trial Mem., Ex. 3A. This study found that blood lead levels from 9.93 µg/dl to 20.07 µg/dl—the same range as Christian's level—were associated with declines in all measures of cognitive development under the MSCA. *See id.*, Figs. 3, 4 (graphs comparing various MSCA scores at age four, based on blood lead levels). Although the study found an especially strong association between lead exposure and "performance" level, the study also found deleterious effects of lead on the children's "verbal," "quantitative," "memory," and "motor" scores. *Id.*

Dr. Wasserman also acknowledges in her study that levels of 6.4 µg/Dl in the Boston study and 16.4 µg/Dl in the Port Pirie study were associated with declines in children's performance on intelligence tests. Def. Trial Mem., Ex. 2A (Wasserman study). Her findings in Yugoslavia "concur" with those studies, finding that "continued Pb exposure [after age 2] imparts additional damage to the developing nervous system." *Id.*

Similarly, Dr. Wasserman concedes that difficulty with two-dimensional figures—which Christian suffers from, and which is related to his language disorder—is associated with lead exposure. (Tr. 640). In other words, the City's expert links the very same injuries from which Christian suffers to the blood lead levels that Christian had during the relevant time frame. *Id.; see also* Pl. Trial Mem., Ex. 4A (study by Dr. Wasserman of 7 year old children in Yugoslavia finding adverse impact of lead on full scale, performance, and verbal IQ scores as measured by WISC test).

Several studies also support the connection between the behavioral problems from which Christian suffers and elevated blood lead levels. *See* Def. Impeachment Ex., Ex. O (Bellinger article); *Id.*, Ex. I (Rosen article). Moreover, the City expressly recognizes in its own literature that, especially in small children, "[l]ead poisoning may cause learning disability, irritability and behavioral problems". Pl.Ex. 15 (pamphlet distributed by DOH to landlords). Perhaps most importantly, the City's expert Dr. Wasserman agrees that lead exposure has a measurable effect on child behavior, although she argues that, at Christian's level of exposure that effect would be minimal. (Tr. 658).

Relying on the results of these and other studies, an interview with Christian, Dr. Freyre's report, Christian's medical records, and DOH records, the plaintiff's expert, Dr. John Rosen, opined that, to a reasonable degree of medical certainty, Christian's various cognitive and behavioral problems were caused by his exposure to lead. Pl.Ex. 19; (Tr. 391–94).

688

The City's first challenge to Dr. Rosen's claim is that Christian's low verbal IQ score shows that whatever difficulties Christian has were not caused by his exposure to lead paint. It points out that several studies have found that a child's performance IQ usually suffers more than his verbal IQ as a result of lead exposure. (Tr. 585–86). Consequently, the City argues that Christian's problems are not consistent with those of a lead-poisoned child.

This argument is without force. First, there are studies which indicate that a child's verbal abilities suffer more than his or her performance abilities. Def. Impeachment Ex., Ex. O, p. 54. The experts, in this trial and generally, agree that exposure to lead, even at low levels, has an adverse affect on a child's performance IQ and verbal IQ. *See, e.g.* Def. Impeachment Ex., Ex. R, Fig. 1 (Baghurst study); Pl. Trial Mem., Ex. 4A (Wasserman study). Thus, a deficiency in verbal IQ is an injury that is attributed to lead exposure. Accordingly, Christian suffers from an injury that is associated with lead exposure; the fact that he does not suffer from an additional injury that is also associated with lead exposure does not change that fact.

By analogy, if a toxin causes three known illnesses, and a person exposed to that toxin has only two of these illnesses, it does not necessarily follow that those two illnesses were not caused by the exposure. Only where the toxin *always* causes the three illnesses in unison, or none at all, could the lack of one particular symptomatic illness be evidence that the other illnesses were from a different cause.

The fact that Christian's "performance" ability is still in the normal range does not mean that he was not damaged by his exposure to lead. Because Christian suffers from many of the injuries that lead poisoning prevention aims to prevent, it is the City's burden to demonstrate another reason for these symptoms. The City offers no evidence that lead will always cause an injury to a child's performance abilities greater than the injury to his verbal abilities, and none of the studies before the Court support this proposition. To the contrary, as in any statistical study, there are children who fall all over the spectrum with respect to the nature of their ailments, some of whom would fall within Christian's category of lower verbal testing than performance testing. (Tr. 437–38) (cross-examination of Dr. Rosen discussing various signature injuries of lead poisoning do not always occur in unison). Moreover, as more fully discussed below, the City did not interview his mother, take a family medical history, or take any other steps to ascertain other possible causes for these injuries.

Thus, the fact that Christian's verbal abilities are lower than his performance abilities does not automatically lead to the conclusion that his injuries were not caused by lead exposure. It could mean that his performance abilities were unusually strong, and thus the damage was not as noticeable, or that his brain or nervous system was unusually susceptible to damage in his verbal abilities. In any case, the bottom line is that Christian suffers from injuries associated with exposure to lead paint, and thus the injuries that resulted were the very injuries that the City's duty was aimed to prevent.

The City's next argument with respect to causation is that Dr. Rosen's opinion failed to exclude other possible causes for Christian's injuries. The City argues that in studies that have found that lead poisoning causes cognitive deficiencies or behavioral problems, lead poisoning has only accounted for a small portion of the variance detected. (Tr. 427–28); *see also* Def. Impeachment Ex., Ex. O, P (studies by Bellinger and Dedrick finding that other environmental factors had greater effect on behavioral problems and IQ loss than did low-level lead poisoning). None of the potential causes offered by the City are credible in this case, however.

Initially, it should be noted that none of the City's allegations of other potential causes are supported by any evidence beyond mere hypothetical surmise by the attorneys and experts. This is precisely the type of evidence that the New York Court of Appeals found to be insufficient to withstand the plaintiff's motion for summary judgment in *Juarez v. Wavecrest Management Team, Ltd.*, 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135 (1996). The plaintiff in *Juarez* introduced evidence that the apartment contained hazardous levels of lead-based paint, that the infant was observed ingesting paint chips and dust, that the infant had elevated blood levels of lead, that the infant was not out of her mother's custody for any substantial period of time and that she did not complain of illness or manifest any behavioral changes prior to moving into the apartment in question. *Id.* at 648, 649 N.Y.S.2d 115, 672 N.E.2d 135. In granting summary judgment in favor of the plaintiffs on the issue of causation, the court explained that:

> [i]n response, defendant submitted speculative assertions by its attorney as to other possible sources of the lead poisoning and [the infant's] behavioral disorders. The bare allegations of counsel, who lacked personal knowledge of the underlying facts, do not constitute competent evidentiary proof sufficient to defeat a motion for summary judgment.... The only other proof offered was an affidavit by [a doctor] who evaluated [the infant]. Although he did not dispute the diagnosis of lead poisoning and even agreed that it may have contributed to [the infant's] deficiencies, [he] speculated that they may also have been the result of her bilingual background and parents' educational level. Such surmise however is insufficient to raise a triable issue of fact.

*Id.* Thus, the New York Court of Appeals held that causation of behavioral problems was established based on the same type of circumstantial evidence presented in the present case. *See also Davis v. City of New York*, 264 A.D.2d 379, 693 N.Y.S.2d 230 (2d Dept.1999) (affirming city liability for pain and suffering of lead poisoned infant with behavioral problems). This holding, especially in light of the prima facie causal link created by the reasoning in *Martin* and *Liriano*, puts the burden on the City to come up with some evidence to support its assertion that another cause was at work in the present case.

Any attempt by the City to claim that Christian's injuries were derived from another source loses credibility by its failure to identify such a potential cause. Dr. Masur testified that Christian's language disorder could "have multiple etiologies including a family history of learning problems and can be exacerbated by reduced facility with English due to cultural factors." (Tr. 539). Dr. Masur, however, found no such family history, nor did he identify any cultural factors that may have been involved in the present case beyond the fact that Christian was bilingual, which he admitted would have no effect unless Christian already had a learning disorder. (Tr. 540–41, 550–51). In addition, Dr. Masur conceded that he did not deal with lead poisoning in his practice, and could express no medical opinion as to what effect long-term lead poisoning will have on a child. (Tr. 549). In light of this concession and his failure to examine any other potential causes, his opinions as to causation are entitled to virtually no weight.

Dr. Wasserman also testified for the City on the issue of causation. She opined that lead exposure normally only accounts for about one fifth of the variance in a given child's cognitive deficiencies as compared to social factors. (Tr. 580). Further she argued that unexplained factors contribute to cognitive deficiencies to an even greater extent than do social factors. (Tr. 583). In other words, similar to Dr. Masur, Dr. Wasserman explained that Christian's cognitive deficits—and presumably his learning disorders—were far more

likely to be the result of social factors or some "unexplained" cause than the result of his lead exposure. (Tr. 582–86). Dr. Wasserman argues that the effect of lead on behavior is also much smaller than other causes. (Tr. 586–87).

On the other hand, she testified that much of the "unexplained" reasons for cognitive deficits can be explained away by learning more information about the child, and the strongest social factor is the home environment—including the quality of parenting and similar factors. (Tr. 583–84). In her own lead study in Yugoslavia, Dr. Wasserman eliminated confounding factors by conducting an "in-home observation and interview," and that review was sufficient to pinpoint lead poisoning as the cause of the deficits she found. (Tr. 665). Put another way, Dr. Wasserman herself felt that other possible causes were sufficiently controlled for in her own study by conducting a home investigation to find that lead caused the various injuries that she documented in the study.

Dr. Wasserman conducted no such investigation in this case. She did not interview Christian or visit or note anything about Christian's home environment.[14] In fact, Dr. Wasserman did not make any credible attempt to identify any other potential cause. (Tr. 607–08, 630–32). As a result, although she surmised that there could be another cause, she failed to identify one or support this conjecture with any evidence.

In fact, the only expert to make an attempt to eliminate other causes was plaintiff's expert, Dr. Rosen. Dr. Rosen reviewed Christian's birth records and pediatric records. (Tr. 385–86). He actually examined Christian, unlike Dr. Wasserman, and considered Christian's sister's school performance. (Tr. 456–57). In addition, he relied on, and agreed with, Dr. Freyre's opinion that Christian's symptoms were consistent with a central nervous system dysfunction, which—if true—would preclude social factors as playing a role. Pl.Ex. 12. Thus, while perhaps he could have done more in this differential etiology, Dr. Rosen's conclusion that Christian's injuries were caused by lead poisoning, as opposed to some other unidentified cause, is substantially more credible than Dr. Wasserman's contrary conclusion. As a result, the City's attempt to counter this determination by proposing hypothetical, largely unidentified, and factually unsupported other causes falls short.

This brings us to the City's strongest challenge to causation, and really the essence of its position. Relying on the myriad studies performed on the effects of lead poisoning, the City contends that the blood lead levels in the present case were too low to cause any significant, appreciable harm. Initially, the City points out that as recently as 1980, 88% of the children in this country had blood lead levels over 10 Sg/dl. (Tr. 413–14). Similarly, in the 1940s and 1950s, the average blood lead level in children was over 30 $\mu$g/dl. (Tr. 416). Thus, the City argues, if blood lead levels of this magnitude were that prevalent and such levels regularly caused learning disabilities and behavioral problems, a large number of people who were children at that time would be so injured. Because this is not the case, the City argues, it follows that lead levels comparable to Christian's would normally not cause the injuries from which Christian suffers.

In further support, the City points out that large studies can observe small cognitive deficiencies that would be otherwise undetectable on an individual basis, and as a result even if a study shows a "significant" association between a toxin and an injury, that injury may be too subtle to perceive on an individual level. (Tr. 426–27). From this statistical evidence, the City concludes that Christian's deficiencies

14. Notably, she is not a medical doctor, and thus would not be qualified to render any opinion as to actual medical causation.

and behavioral problems could not have been the result of his lead poisoning because his blood lead level was not sufficiently elevated to cause such serious results.

Accordingly, the City argues that no damages can be awarded because whatever effect the lead poisoning had on Christian, it could not have caused his deficiencies or behavioral problems, and similarly could not have been a substantial factor in his difficulties at school. Put another way, the City argues that Dr. Rosen's opinion that Christian's injuries were caused by his lead poisoning is contradicted by the lead poisoning studies which would indicate that the impact of these blood lead levels would normally not cause serious cognitive deficits or behavioral problems. Thus, because the City does not deny that Christian suffers from the deficiencies or behavioral problems, its position is that Christian would have had the same problems regardless of his exposure to lead.

Dr. Rosen did not dispute that the studies do not support the idea that learning disabilities and severe behavioral problems would be expected from the blood lead levels Christian was found to have had. Instead, Dr. Rosen responded by arguing that the studies show only overall average impact, and do not prove that Christian, as an individual, was not impacted to the point of requiring tutoring or special schooling.

What follows from Dr. Rosen's claim is that Christian's deficiencies and behavioral problems resulted from relatively low levels of lead poisoning for one of two reasons: first, that Christian's lead poisoning had a greater impact on Christian than it would on the average child represented by the study results because Christian—as an individual—is unusually susceptible to lead poisoning; or, second, that Christian is not unusually susceptible to lead poisoning, and—absent lead exposure—he would have barely been able to successfully perform in school, but the small impact that the lead had on him pushed him to the point of being unable to complete his schoolwork without additional tutoring and counseling.

If either of these theories is correct, the injuries from which Christian suffers are not inconsistent with the studies. Under the first theory, Christian would simply be an individual on the very high end of the scale as far as impact of lead exposure. Accordingly, while he would not be in the heart of the average response distribution, he would still be comparable to individuals in the study. Under the second theory, the impact on Christian was the small impact that would normally be expected on an average child, but because of what Christian's abilities and behavioral tendencies were to begin with, even a small impact was sufficient to have caused Christian's academic problems.

 In either event, the City would be liable. If Christian is unusually susceptible to lead poisoning, the City would be liable for all of Christian's injuries because under New York law "a defendant is chargeable for all the harm and suffering which his negligent act brought on even though the plaintiff's injuries were aggravated by his own predisposition or weakness." *Owen v. Rochester–Penfield Bus Co.,* 304 N.Y. 457, 461, 108 N.E.2d 606 (1952) (internal quotation omitted). Similarly, if Christian would have been barely able to make it through school, but the small impact of the lead poisoning was enough to make it impossible for him to compete without additional tutoring and counseling, the City would be liable because under New York law the defendant is liable for the damages caused where plaintiff's preexisting condition is exacerbated by the defendant's conduct. *See Bartolone v. Jeckovich,* 103 A.D.2d 632, 635, 481 N.Y.S.2d 545 (4th Dept.1984) (holding the defendant liable where a preexisting psychotic illness was not severe enough to prevent the plaintiff from functioning, but aggravation of that illness resulting from the defendant's conduct left him permanently disabled) (citing *McCa-*

*hill v. New York Trans. Co.*, 201 N.Y. 221, 94 N.E. 616 (1911)). Consequently, the City would be liable for the injuries in this case under either of the above theories.

The issue then becomes whether it is more probable than not that one of these two theories is correct, or is it equally or more probable that Christian would have had the deficiencies and behavioral problems absent his exposure to lead. This is not an easy issue to resolve, especially considering the sparsity of evidence on either side. Several factors do weigh in favor of the plaintiff, however.

Initially, as explained above, the likelihood that social causes were at work has been diminished to some extent by Dr. Rosen's review of the medical and factual background. This limited differential etiology makes it more probable that lead poisoning was a proximate cause. Similarly, the City does not dispute that Christian's birth records reflect a normal, healthy baby, or that Christian reached his developmental milestones at normal times. (Tr. 493). Thus, while this evidence does not prove that Christian would not have had the deficiencies and behavioral problems prior to his lead exposure, it increases the probability that he would not.

In contrast, the City provides absolutely no evidence that he would have suffered from the deficiencies or behavioral problems regardless of his lead exposure. As discussed above, Dr. Wasserman did not make any attempt to identify any other cause for Christian's condition, despite the fact that she conceded that it is possible to control for confounding factors by investigating the infant's home environment. Nor did she, or anyone else, make any attempt to ascertain whether Christian had any family history of such deficiencies or behavioral problems. Her opinion that Christian would have had his injuries regardless of lead exposure is based on the assumption that there is another cause—whether it be genetics or an environmental cause. This position becomes less credible for the reasons discussed above.

Dr. Wasserman's position also loses credibility because it was based on the erroneous assumption that the City was only liable for Christian's lead exposure after the special relationship attached. (Tr. 599–600). Thus, her opinions were based on a lower level of exposure, approximately 13 μg/dl (Tr. 599), than should have been considered. Christian's blood lead level averaged approximately 18 μg/dl for the first year of exposure, with a high point of 30 μg/dl, then averaged 13 μg/dl for the remainder of time, never dropping below 11 μg/dl. Pl.Ex. 19. Because the City is jointly and severally liable for the entire injury, Christian's entire exposure should have been considered.

Moreover, it is beyond doubt that Christian was harmed to some extent by his lead exposure. It is true that we will never know what Christian's abilities would have been absent his exposure to lead, but at a minimum we know that they would have been better, even if only minimally so, than they are now. Thus, this is not a case like many toxic tort cases where the defendant can argue that the toxin had absolutely nothing to do with the injury— the City in the present case only argues that the impact was small.

These factors dictate that it is more probable than not that Christian's lead poisoning was a substantial factor in causing his deficiencies and his behavioral problems. Although the experts agree that the impact of the blood lead levels similar to Christian's would be expected to be small, in this particular case that impact was sufficient to cause Christian's deficiencies and behavioral problems. Whether this outcome results from his predisposition to cognitive difficulties and behavioral problems or his susceptibility to lead poisoning is immaterial because, as explained above, in either event the City would be liable. Therefore, the City's negligent conduct in failing to protect Christian from lead poisoning was a substantial factor in

causing his difficulties in school, and the City is liable for the damages caused thereby.

### (4)

### Damages

█ The plaintiff has offered two theories on economic damages. The first is the theory that, as a result of his learning disorders and behavioral problems, Christian will be relegated to a life of earning minimum wage, instead of, at the least, earning what the average high school graduate earns. On this theory, plaintiff seeks economic damages in the form of lost future earnings.

In this regard, Dr. Seymour Barcun, an economist, testified as to the projected salaries of a high school graduate and a lifelong minimum wage earner for what would be Christian's expected working life. He then adjusted for time value of money, and subtracted the latter figure from the former, leaving him with a difference of approximately $387,000. (Tr. 289–93); Pl. Ex. 14. This, plaintiff contends, is the measure of economic damages.

In this case, this figure is not a proper measure of damages because it is unsupported by the evidence. There is no evidence to support the proposition that Christian is, more probably than not, going to earn the minimum wage for the rest of his life. Common sense indicates that too many other variables would have an effect on what Christian will earn, and as many other variables could explain why—if at all—he ends up earning minimum wage. It would be overly pessimistic speculation to assume that this is Christian's fate. Second, there is no evidence, nor any reason to believe, that, absent the lead poisoning, Christian would be earning what an average male high school graduate earns. It seems that a more appropriate comparison, if any exists, would be an average male with Christian's background, including those that finished high school, as well as those that finished college, vocational school or any other type of professional training. Finally, and most importantly, all of the evidence, even from plaintiff's own witnesses, is that Christian can make up his deficits with proper remediation, tutoring, and counseling.

As a result, this damages theory rests on subtracting one faulty number from another faulty number, based on a the speculative premise that Christian's fate has already been decided. Accordingly, this measure of damages is rejected. *See Davis v. City of New York*, 264 A.D.2d 379, 693 N.Y.S.2d 230 (2d Dept.1999) (rejecting similar damages claim in lead poisoning case).

As a second measure of damages, plaintiff submits the costs of the remediation necessary to allow Christian to catch up and keep up in school. Dr. Rosen testified that such costs would include attending a private school with a high teacher to student ratio, counseling from a social worker or therapist to help his self-esteem, and tutoring to help him with his schoolwork. (Tr. 402). Indeed, Dr. Wasserman agreed that, even small decreases in cognitive abilities and increases in behavioral problems that she would associate with lead poisoning could lead to a two-fold increase in the number of students requiring educational assistance. (Tr. 674). This concession acknowledges the possibility that certain individuals, like Christian, would require this type of remediation even where the lead exposure was small.

Dr. Rosen also opined as to the cost of this remediation. He estimated that the tutor would cost $50 to $75 per session and would be necessary three times per week, the social worker or psychologist would cost $150 per session and would be necessary two to three times per week, and the private school would cost $20,000 to $30,000 per year. (Tr. 403). Significantly, the City did not challenge any of these figures by introducing evidence of less expensive remedies, or even cross-examining Dr. Rosen. Accordingly, these figures, while they may appear somewhat high, are completely unrebutted. This is the proper measure of economic damages in this case.

Christian is currently repeating second grade, so he will require help in school for ten and one-half more years. Taking a conservative estimate from Dr. Rosen's figures, this will amount to $20,000 per year for school tuition at a private school, starting next year. In addition, if Christian receives tutoring costing $150 per week for the forty weeks of a typical school year, this would amount to $6,000 per year for ten and one-half years. Finally, if Christian receives counseling year-round costing $300 per week, this would amount to $15,600 per year for ten and one-half years. Thus, the City is liable for $10,800 for counseling and tutoring for the remainder of Christian's second grade school year, and, in addition, $41,600 per year over the next ten years. Thus, adjusted for the time value of money, the total award is approximately $385,000.[15]

SO ORDERED.

---

15. This figure represents $10,800 for this school year, plus $373,75.53—which represents $41,600 per year starting next year discounted by 2% per year. The 2% figure is the proper net discount—representing interest cleansed of inflation-in this circuit where the parties do not introduce any alternative method of calculation. *See Ramirez v. New York City Off–Track Betting Corp.*, 112 F.3d 38, 41 (2d Cir.1997); *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 745–46 (2d Cir. 1988). The exact figure after this adjustment is $373,675.53 plus $10,800, or $384,475.53.